## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| CHRISTOPHER VENEGAS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No. 2:14-cv-249-NT |
| | ) | |
| GLOBAL AIRCRAFT SERVICE, INC. | ) | |
| and LUFTHANSA TECHNIK NORTH | ) | |
| AMERICA HOLDING CORP., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND DEFENDANTS' MOTIONS FOR COLLECTIVE ACTION DECERTIFICATION

Before the Court are the Plaintiffs' motion for class certification with respect to their state law claims (ECF No. 73) and the Defendants' motions for collective action decertification with respect to the Fair Labor Standards Act claims (ECF Nos. 94 & 95). For the reasons stated below, the Plaintiffs' motion is **GRANTED** and the Defendants' motions are **DENIED**.

## FACTUAL BACKGROUND

In 2007, Deutsche Lufthansa Berlin-Stiftung purchased three Lockheed Super Star aircraft at auction. LTNA Am. Answer ¶ 13 (ECF No. 38). Defendant Lufthansa Technik North America Holding Corporation ("**LTNA**") was tasked with restoring one of the planes to airworthy condition. LTNA Am. Answer ¶ 14. The Super Star restoration project began in 2008 in an LTNA hangar on the grounds of the Lewiston-Auburn Municipal Airport in Auburn, Maine. LTNA (Lusky) Dep. 17:11-17 (ECF No.

80-3). In 2009, LTNA contracted with Defendant Global Aircraft Service, Inc. ("**GAS**") to provide workers to deseal the plane's wings, change out fasteners and dome nuts, and reseal the wings. GAS Dep. 18:23-19:23 (ECF No. 73-1). The point of this process, which GAS characterizes as "repair[ing] the wing fuel system," was to address corrosion and remove any microbial growth from the aircraft's wings. Oct. 8, 2014 Young Decl. ¶ 3 (ECF No. 79-2); *see* GAS Dep. 25:3-10 (ECF No. 73-1).[1] Performing this type of work for clients was within GAS's regular course of business. GAS Dep. 25:3-11 (ECF No. 73-1); Oct. 8, 2014 Young Decl. ¶ 2. GAS typically classifies workers it sends to such projects as employees, but for the Super Star project, it classified most of the workers it sent to Auburn as independent contractors. GAS Dep. 23:16-22, 25:11-20 (ECF No. 73-1).

As GAS began its wing work, it became clear that there was significant corrosion inside at least one wing and on other parts of the aircraft. GAS Dep. 26:3-14 (ECF No. 79-1); Oct. 8, 2014 Young Decl. ¶ 4. In light of these developments, LTNA asked GAS to provide sheet metal technicians to help with the additional work. GAS Dep. 26:3-14 (ECF No. 79-1). In 2010, GAS agreed to supply sheet metal workers to LTNA on the Auburn site.[2] Oct. 8, 2014 Young Decl. ¶¶ 4-6. These workers all signed the same agreement with GAS to work as independent contractors at an hourly rate,

---

[1]    For ease of reference, I repeat Electronic Case File ("ECF") numbers in this Order where a piece of evidence appears in multiple places on the docket.

[2]    The record shows that some of the new workers were called "structural technicians" once on the project. Oct. 8, 2014 Young Decl. ¶ 6 (ECF No. 79-2).

restoring the Super Star aircraft.[3] GAS Dep. 57:10-20, 58:6-9 (ECF No. 73-1). Venegas himself began working on the project in early 2013. July 18, 2014 Venegas Decl. ¶ 3 (ECF No. 44-1).

## PROCEDURAL BACKGROUND

Plaintiff Venegas filed suit in 2014 on behalf of himself and other workers on the Super Star project alleging violations of federal and Maine wage and hour laws. Compl. ¶¶ 62-69 (ECF No. 1). The crux of Venegas's claims is that GAS and LTNA (the "**Defendants**"[4]) misclassified him and other workers as independent contractors, meaning they were not paid all legally-required wages. Compl. ¶¶ 63-64, 66-68. In early 2015, I conditionally certified a group of metal workers on the Super Star project as a collective action under the federal Fair Labor Standards Act. Order on Pl.'s Mot. for Conditional Certification 8-9 (ECF No. 56).

In August of 2015 I held a conference of counsel to discuss class certification/collective action decertification motions, a motion for summary judgment on exemption/preemption, and a contemplated motion from LTNA on joint employer issues. *See* Local Rule 56(h) Pre-Filing Conference Report & Order 1-3 (ECF No. 93).

---

[3]    There was minimal variation in the workers' hourly rates of pay. *Compare, e.g.*, Lopez Dep. 22:11-16 (ECF No. 79-3), *with, e.g.*, Rodgers Dep. 76:4-8 (ECF No. 90-4).

[4]    At times in this order I refer to the "Defendants" collectively, but I will not substantively resolve the joint employer question until (and if) LTNA makes a motion on that issue. For purposes of the class certification/collective action decertification motions only, the Plaintiffs have sufficiently demonstrated that LTNA and GAS are joint employers of the proposed class/collective. Specifically, the evidence shows that LTNA had the power to terminate class members, supervise their work, and control their work schedules and other conditions of employment. *See Director of the Bureau of Labor Standards v. Cormier*, 527 A.2d 1297, 1299 (Me. 1987); *Affo v. Granite Bay Care, Inc.*, Nos. 2:11-cv-482-DBH, 2:12-cv-115-DBH, 2013 WL 2383627, at **9, 11 (D. Me. May 30, 2013).

3

Counsel agreed that the class certification/decertification motions should be resolved first. Local Rule 56(h) Pre-Filing Conference Report & Order 1.

In the motion for class certification, the Plaintiffs request that I certify a Federal Rule of Civil Procedure 23(b)(3) class with respect to their state law claims, defined as follows:

> All sheet metal workers and mechanics at any time since June 24, 2009, whom Defendants classified as independent contractors and who worked on Defendants' aircraft restoration project occurring in Auburn, Maine, such that they were not paid for overtime work performed at a rate equal to one and one-half times their regular compensation rate.

Pls.' Mot. for Class Certification 2 (ECF No. 73).

Additionally, both Defendants now seek to have me decertify the collective action which I conditionally certified on February 5, 2015. Global Aircraft Service, Inc.'s Mot. to Decertify the Conditional Certification of this Matter as a Collective Action Under the FLSA ("**GAS Mot. to Decertify**") (ECF No. 94); LTNA's Mot. to Decertify Collective Action ("**LTNA Mot. to Decertify**") (ECF No. 95).

## DISCUSSION

## I.    Motion to Certify the Class Action

### A.    Legal Standard

Federal Rule of Civil Procedure 23 governs class actions. Under that rule, an individual may sue in a representative capacity if certain conditions are met. First, the party moving for class certification must demonstrate the following prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Next, the named plaintiff must show that the class is maintainable under one of the types of class actions described in Rule 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2548 (2011). Plaintiffs seeking damages proceed under Rule 23(b)(3). "To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.' " *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23(b)(3)).

### B.    Application: Rule 23(a) Prerequisites

As described below, Venegas has established the Rule 23(a) prerequisites: numerosity, commonality, typicality, and adequacy.

#### 1.    Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Rule 23(a)(1) does not mandate any strict numerical cut-off for class certification, but courts in this circuit have generally found that a class of 40 or more individuals satisfies numerosity. *See, e.g.*, *Coffin v. Bowater, Inc.*, 228 F.R.D. 397, 402 (D. Me. 2005). Here, Venegas maintains that the class would consist

of "well over" 80 workers.[5] Pls.' Mot. for Class Certification 14. The numerosity requirement is met.

## 2.   Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." The Supreme Court analyzed this requirement at length in *Wal-Mart, Inc. v. Dukes*, 131 S. Ct. 2541, 2550-2557 (2011). Under *Dukes*, commonality analysis requires an understanding of the merits of the plaintiffs' underlying claims. *Dukes*, 131 S. Ct. at 2552. The *Dukes* majority directs courts resolving class certification motions to consider not just whether there exist common questions among the class, but also whether there exist " 'common answers apt to drive the resolution of the litigation.' " *Id.* at 2551 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

In *Dukes*, a group of employees alleged that Wal-Mart's practice of affording discretion to local managers over pay and promotion decisions caused a disparate impact on women, and the company's failure to limit that discretion, knowing men were disproportionally advantaged by it, amounted to disparate treatment. *Dukes*, 131 S. Ct. at 2548 (citing 42 U.S.C. § 2000e-2(a), (k)). Given the facts of the case and the applicable legal standard, in order to establish liability the employees would have had to come forward with " 'significant proof' that Wal-Mart 'operated under a general policy of discrimination.' " *Id.* at 2553 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 159 n.15 (1982)). The Court found that Wal-Mart's policy of allowing discretion

---

[5]      Neither Defendant has challenged numerosity.

for local managers did not meet that standard. *Id.* at 2555-56. The Court explained that the commonality requirement meant that there needed to be a common answer to the question of why each employee was disfavored. *Id.* at 2552. But on the record before it, there was no evidence that local managers exercised discretion in some common fashion. *Id.* at 2555-56. Thus, since the same employment practices did not "touch and concern all member of the class," there were no common questions of law or fact. *Id.* at 2557 n.10 (internal quotations and citation omitted).

Under Rule 23(a)(2) plaintiffs are required to identify at least one common contention capable of class-wide resolution. *Dukes*, 131 S. Ct. at 2556. Here, liability will be determined by whether the workers are properly classified as employees or independent contractors. That single question was enough to satisfy "commonality" in a similar, post-*Dukes* class action involving delivery truck drivers who were also claiming employee rather than independent contractor status. *See Scovil v. FedEx Package Sys., Inc.*, 886 F. Supp. 2d 45, 48 (D. Me. 2012). Similar to the plaintiffs in *Scovil*, each worker in this case signed the same agreement with GAS that classified him or her as an independent contractor. GAS Agreement (ECF No. 80-2); GAS Dep. 57:16-20 (ECF No. 73-1). This case is distinguishable from *Dukes* on the matter of commonality. Liability will be driven by a common question: were the class members misclassified? The same practice—the classification of workers as independent contractors—touches all members of the class. The commonality requirement is satisfied.

### 3.   Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Typicality is satisfied when the representative plaintiff's "injuries arise from the same events or course of conduct as do the injuries of the class and when plaintiff's claims and those of the class are based on the same legal theory." *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008).

Venegas, like the rest of the class, worked for an hourly wage on the Super Star restoration project in Auburn, Maine. Venegas's alleged injuries arise from the Defendants' decision to classify him as an independent contractor rather than an employee for the time he engaged in that work. The class members' purported injuries arise from that same decision. Venegas's legal theory—that the Defendants misclassified him—is the same legal theory as the rest of the class. The Defendants have not identified any defenses that are unique to Venegas.

The Defendants suggest that Venegas is not typical of the rest of the class because his experiences on the Super Start project were different than other class members. GAS Opp'n to Pls.' Mot. for Class Certification 18-20 ("**GAS Opp'n**") (ECF No. 79); LTNA Opp'n to Venegas Mot. for Class Certification 13-14 ("**LTNA Opp'n**") (ECF No. 80). For example, Venegas worked on tasks like researching parts, inventorying, billing, and reporting to supervisors, while other class members did not. GAS Opp'n 19. But the Defendants have not explained why such differences will prevent Venegas from advancing the interests of the class as this case progresses. As the Plaintiffs point out, the Defendants have not argued that Venegas was exempt

8

from overtime laws because of these different job duties. Pl.'s Reply 4 (ECF No. 90). The typicality requirement is satisfied.

### 4.    Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." The adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent," and "factors in competency and conflicts of class counsel." *Amchem Prods., Inc.*, 521 U.S. at 625, 626 n.20.

### a.    Named Plaintiff

LTNA argues that Venegas will not adequately represent the class because he had a supervisory role with respect to other class members.[6] LTNA Opp'n 14-16. The proper inquiry is whether this difference in roles will make Venegas's interests diverge from the rest of the class. *See* William B. Rubenstein, *Newberg on Class Actions* § 3:58 (5th ed. 2014).

LTNA has identified two Title VII cases where supervisors were deemed inadequate representatives for classes of supervisory and nonsupervisory employees. LTNA Opp'n 15 (citing *Wagner v. Taylor*, 836 F.2d 578 (D.C. Cir. 1987); *Fewlass v. Allyn and Bacon, Inc.*, No. 76-3685-T, 1978 WL 149 (D. Mass. 1978)). But part of the adequacy problem in those cases was that the named plaintiff had evaluative authority over other class members, meaning that Title VII liability could ultimately turn on actions the named plaintiffs took against other class members. *Wagner*, 836

---

[6]    GAS does not specifically address the adequacy requirement with respect to Mr. Venegas.

F.2d at 595; *Fewlass*, 1978 WL 149, at *1. Unlike these Title VII cases, liability in this case will not turn on actions taken among class members, but rather on the relationship between class members and the Defendants. So even if Venegas performed supervisory duties, he is not at odds with other class members on the legal theory uniting the class: whether the Defendants properly classified the workers as independent contractors. The adequacy requirement is satisfied.

### b.   Attorneys

Neither Defendant has challenged the adequacy of the Plaintiffs' counsel, but I must assess it in order to appoint class counsel, as Rule 23(g) instructs. Nicholas Woodfield of The Employment Law Group, P.C. has provided information on his experience and expertise in the area of wage and hour misclassification cases. *See* June 15, 2015 Decl. of Nicholas Woodfield (ECF No. 73-4). Attorney Woodfield has been involved in this suit at least since the Complaint was filed in June of 2014. *See* Compl. His filings reflect a commitment of time and resources to representing the class. I find that Attorney Woodfield will adequately represent the class.[7]

### C.   Application: Rule 23(b)(3) Requirements

Once a plaintiff seeking class certification has met the Rule 23(a) prerequisites, that plaintiff must next demonstrate that common questions predominate over any

---

[7]      Attorney R. Scott Oswald of The Employment Law Group, P.C. and Attorneys Jeffrey Neil Young and Allison G. Gray of Johnson, Webbert & Young have also requested appointment as class counsel. Pls.' Mot. for Class Certification 20 (ECF No. 73). Before I can make that determination, I would need supporting declarations from these attorneys addressing the standard set forth in Rule 23(g).

individual questions, and that handling the matter as a class action is superior to other methods of resolving the controversy. Fed. R. Civ. P. 23(b)(3).

### 1.   Predominance

Predominance analysis requires me to determine whether common questions predominate over individual questions. *See* Fed. R. Civ. P. 23(b)(3); *Scovil*, 886 F. Supp. 2d. at 48. With respect to the predominance requirement, "the need for some individualized determinations at the liability and damages stage does not defeat class certification." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015). "Rather, the question is whether there is 'reason to think that [individualized] questions will overwhelm common ones and render class certification inappropriate . . . .' " *Id.* (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014)).

To analyze whether individual issues will overwhelm common ones, I must begin by identifying what the class members will ultimately have to prove to prevail on their state law claims. Liability in this case will turn on whether the class members were properly classified as independent contractors, or whether they instead should have been classified as employees. "Employees" are covered under Maine's minimum wage and overtime laws; independent contractors are not. 26 M.R.S.A. § 664; *see also* 26 M.R.S.A. §§ 663(3), 670.

The Law Court has not yet had an occasion to describe the test to be used to determine whether a worker is an employee or an independent contractor under 26 M.R.S.A. § 664, but Judge Hornby, deciding a class certification question in a case similar to this one, has predicted that the Law Court is likely to apply the "right to control" test which utilizes the eight-factors set forth in *Murray's Case*, 154 A. 352

(Me. 1931).[8] *Scovil*, 886 F. Supp. 2d at 49-53. These eight factors, "although not necessarily concurrent or each in itself controlling," are:

> (1) the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price; (2) independent nature of his business or his distinct calling; (3) his employment of assistants with the right to supervise their activities; (4) his obligation to furnish necessary tools, supplies, and materials; (5) his right to control the progress of the work except as to final results; (6) the time for which the workman is employed; (7) the method of payment, whether by time or by job; (8) whether the work is part of the regular business of the employer.

*Murray's Case*, 154 A. at 354. I agree with Judge Hornby that this is the likely test for the state claims in this case, and I also agree that "the right to control, the nature of the work, and its importance to [the employer's] business" are the most critical factors when analyzing a claim under a statute designed to protect workers.[9] *Scovil*, 886 F. Supp. 2d at 52-53, 54; *see also Affo v. Granite Bay Care, Inc.*, Nos. 2:11-cv-482-DBH, 2:12-cv-115-DBH, 2013 WL 2383627, at *16 (D. Me. May 30, 2013). For purposes of determining whether the predominance requirement of Rule 23(b)(3) is met, the inquiry is whether common proof will govern the analysis of the factors. Therefore, at this juncture I address whether common issues predominate rather than the merits.

---

[8]   Judge Hornby concluded that that the same factors would likely apply in evaluating employee-status under 26 M.R.S.A. §§ 626, 629, and 664. *Scovil v. FedEx Package Sys., Inc.*, 886 F. Supp. 2d 45, 51 (D. Me. 2012).

[9]   Thus I do not agree with GAS that the state law classification question will be resolved through the "economic realities" test used in the federal Fair Labor Standard Act context. *See* GAS Opp'n to Pls.' Mot. for Class Certification 4 (ECF No. 79); *see also Scovil*, 886 F. Supp. 2d at 49-50, 53 n.10. Although there is much overlap between the *Murray's Case* factors and economic realities test factors, there is also an important difference. *See infra* 22.

The first *Murray's Case* factor is the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price. *Murray's Case*, 154 A. at 354. Here, each worker signed the same agreement with GAS to work for an unspecified amount of time, at an hourly rate, with weekly paydays. GAS Agreement; GAS Dep. 57:16-20 (ECF No. 73-1). Each worker agreed that "the length of contract will be determined by workload and performance." GAS Agreement. The parties have not pointed to any other agreements defining the relationship between the workers and the Defendants. There will be common proof on whether any of the workers had contracts for the performance of a specific piece or kind of work for a fixed price.

The second factor is the independent nature of the worker's business or distinct calling. *Murray's Case*, 154 A. at 354. The Law Court has identified this factor as being important in evaluating a worker's classification. *Legassie v. Bangor Pub. Co.*, 741 A.2d 442, 445 n.4 (Me. 1999). "An independent contractor is one who carries on an independent business, and in the line of his business is employed to do a job of work . . . ." *Murray's Case*, 154 A. at 353 (internal citations and quotations omitted). Of the eighty or so workers in the proposed class, three had their own incorporated businesses. GAS Dep. 30:19-31:4 (ECF No. 73-1). So, evidence on this aspect of factor two will be largely common. However, factor two also covers whether sheet metal and mechanic work was class members' "distinct calling"—"distinct," meaning different from the Defendants' regular businesses, and "calling," meaning a skilled occupation in its own right. *See Timberlake v. Frigon & Frigon*, 438 A.2d 1294, 1297 (Me. 1982). As addressed below with factor eight, whether sheet metal and mechanic work was

13

different from the Defendants' regular businesses will be common across the class. There will be some variation across class members on their level of skill, experience, and expertise with sheet metal and mechanic work—meaning, whether it was a "calling." *Compare, e.g.*, Ramirez Dep. 27:2-16 (ECF No. 79-7), *with, e.g.*, Rodgers Dep. 19:10-20:18 (ECF No. 80-3). But the record also shows that most workers at least had extensive experience working in the aviation industry. *See* Objs. & Resps. to Def. GAS's First Set of Interrogs. (responding to interrogatory number three on other positions held in the aviation industry) (ECF No. 80-1). Thus, there will be some, but not overwhelming, variation among class members on this factor.

The third factor is the worker's employment of assistants with the right to supervise their activities. *Murray's Case*, 154 A. at 354. There is no evidence that class members employed their own assistants to work on the Super Star project. This factor is subject to common proof.[10]

The fourth factor is the worker's obligation to furnish necessary tools, supplies, and materials. *Id.* Class members were generally required to bring their own hand tools—meaning those tools that would fit in their personal toolboxes.[11] July 18, 2014

---

[10]   LTNA's argument to the contrary misrepresents the record and misconstrues the law. *See* LTNA Opp'n to Venegas Mot. for Class Certification 20-21 ("**LTNA Opp'n**") (ECF No. 80). The evidence shows that LTNA engaged Richard Brown's spouse to pick people up from the airport and that several workers hired accountants to assist with their taxes. *See* LTNA (Lusky) Dep. 34:17-39:6 (ECF No. 80-3); Klehn Dep. 31:9-22 (ECF No. 80-3); Rojas Dep. 27:4-24 (ECF No. 80-3); Cull Dep. 58:14-16 (ECF No. 80-3); Goodman Dep. 103:1-104:22 (ECF No. 80-3); Venegas Dep. 154:19-23 (ECF No. 79-12). *LTNA* made the requests for Mr. Brown's spouse to pick people up at the airport and *LTNA* compensated her for those services. There is no evidence that the individual workers' accountants performed work on the Super Star project.

[11]   The Defendants point out that one worker borrowed some hand tools through an on-site sign-out system until he built up his own collection and another worker brought no hand tools at all. Klehn Dep. 21:19-22:11 (ECF No. 79-4); Rodgers Dep. 84:16-17 (ECF No. 79-5). This evidence does not change the fact that workers were generally responsible for bringing their own hand tools. As the Plaintiffs

Venegas Decl. ¶ 11; GAS Dep. 31:16-22 (ECF No. 73-1). LTNA provided the larger, more expensive tools that remained on the project site, such as an English wheel and a metal brake. GAS Dep. 32:12-22 (ECF No. 73-1). LTNA also provided the project's raw materials, including screws and sheet metal. GAS Dep. 32:2-11 (ECF No. 73-1). There will be common proof on whether workers were required to bring tools, supplies and materials.

The fifth factor—which has been singled out as a crucial factor—is the worker's right to control the progress of the work, except as to final result. *Murray's Case*, 154 A. at 354; *Scovil*, 886 F. Supp. 2d at 52-53 (collecting cases). The Defendants maintain that there was wide variation among the workers on the level of direction and supervision they received. GAS Opp'n 5-7, 9; LTNA Opp'n 2-3, 22. The evidence does show that some class members largely performed their assigned tasks with autonomy, while others had periods of constant supervision. *Compare, e.g.,* Ramirez Dep. 27:2-16 (ECF No. 79-7), *with, e.g.*, Rodgers Dep. 82:23-83:4 (ECF No. 79-5). But the factor five question is whether the Defendants had the *right* to control the workers' progress, not whether the Defendants actually exercised that right. GAS agreed that LTNA would provide supervision and job assignments to the workers and dictate their work schedules. GAS Dep. 49:5-21, 57:21-25 (ECF No. 73-1). Workers had to ask in advance if they wanted to take time off for vacation and at times had to move their vacations to accommodate the project schedule. *See, e.g.*, Goodman Dep.

_____

point out, Klehn only borrowed hand tools until his own tools were shipped to Maine, and Rodgers primarily worked with larger tools that stayed on the job site. *See* Pl.'s Reply 5 (ECF No. 90).

95:6-8 (ECF No. 79-11); Huynh Dep. 80:17-81:10 (ECF No. 79-9); Oct. 14, 2014 Stainback Decl. ¶ 14 (ECF No. 50-2). LTNA had a general rule that workers limit lunch periods from 11:30 a.m. to noon, though seemingly did not enforce it. Oct. 14, 2014 Stainback Decl. ¶ 11.

Another aspect of the right to control is whether "if instructions were given they would have to be obeyed," meaning whether the worker could be discharged for disobedience. *Murray's Case*, 154 A. at 354; *see also Timberlake*, 438 A.2d at 1297 ("In the past we have emphasized the right to control and stated that it is best established by the right in the employer to discharge the employee at will."). Over the course of the project, Joe Lusky of LTNA (the project's chief inspector and production manager) decided to terminate workers because they were not working hard enough or "weren't producing the quality needed or the right attitude." GAS Dep. 47:16-18 (ECF No. 73-1). There will be common proof on whether the Defendants had the right to control the workers as to the progress of their work.

The sixth factor is the time for which the worker is employed. *Murray's Case*, 154 A. at 354. The length of time each class member worked on the project varies.[12] Oct. 8, 2014 Young Decl. ¶ 19 ("Some had extended stays on the project while others were of shorter durations."). However, there is common ground among the class as to

---

[12]     By way of background, GAS originally thought it was providing workers to LTNA for a "short-term," "presumed to be a seven-, eight-month-long job." GAS Dep. 25:21-26:2 (ECF No. 73-1). But due to the amount of work required, GAS has actually provided workers from 2009 through at least mid-2015. *See* GAS Dep. 27:17-20 (explaining that there were approximately 28 workers on the project in February of 2015) (ECF No. 73-1); Cull Dep. 22:23-24 (stating that he was still on the project in May of 2015) (ECF No. 79-10); *see also* Oct. 8, 2014 Young Decl. ¶ 19 ("The Project was intended to be of a shorter duration, but the aircraft's additional work needs identified over time has resulted in the continuation of this Project for longer than initially expected.").

the full-time nature of their work. Save one proposed class member who was rehired on a part-time basis, class members worked hours that precluded other employment. Klehn Dep. 26:4-28:20 (ECF No. 80-3) (describing how he returned for a second stint on the project while also working on-call for Amtrak); Cull Dep. 66:21-67:2 (ECF No. 80-3) ("They want 50 hours a week."); Lopez Dep. 38:5-11 (stating that he was told to be at the hangar from 6am to 4pm) (ECF No. 80-3); Rodgers Dep. 65:1-15 (explaining that no one told her she couldn't work elsewhere, "but the hours we worked, there was no time to work another job.") (ECF No. 90-4). Timesheets in the record confirm the full-time nature of the class members' work on the Super Star project.[13] Timesheets (ECF No. 79-14). There will be a mix of common and individual proof on the time for which the workers were engaged on the project.

The seventh factor is whether payment was made by time or by job. *Murray's Case*, 154 A. at 354. The eighth factor is whether the work is part of the regular business of the employer. *Id.* The Law Court has identified this eighth factor as being particularly important in evaluating how a worker should be classified. *Legassie*, 741 A.2d at 445 n.4. LTNA concedes that common questions will prevail over individual questions on these seventh and eighth factors. LTNA Opp'n 18-19 n.24.[14] The record evidence confirms common proof on these factors. *See* GAS Dep. 16:24-17-8 (ECF No. 79-1); Oct. 8, 2014 Young Decl. ¶ 2; Timesheets.

---

[13]     Specifically, five of the timesheets show over 40 hours of work for the week of March 31, 2014 to April 6, 2014. Timesheets (varying from 48 to 62 hours) (ECF No. 79-14). One timesheet shows no hours, but it is Klehn's, and at the time he had a part-time work arrangement with the Defendants. One time sheet shows 23 hours, but that worker was on vacation for all but two days that week.

[14]     GAS does not address the *Murray's Case* factors in its briefing.

For its part, GAS argues that as a general rule in misclassification cases, without operating agreements or policy manuals governing the nature of the work and establishing the nature of the working relationship, plaintiffs cannot make the required showing on commonality or predominance.[15] GAS Opp'n 15-17. The nature of class members' work is relevant for some of the *Murray's Case* factors—most directly factor eight—but that factor does not require that all class members perform the *same* work, it evaluates whether the work they do is part of the employer's regular business. The existence of common governing documents is not the only way to show control. Here, for example, perhaps Venegas's strongest evidence on control (*Murray's Case* factor five) is testimony from GAS representatives that LTNA supervisor Joe Lusky fired workers over the course of the project for reasons that included not working hard enough and not having "the right attitude." GAS Dep. 47:8-18 (ECF No. 73-1); *see Timberlake v. Frigon & Frigon*, 438 A.2d 1294, 1297 (Me. 1982).

Six of the eight *Murray's Case* factors are subject to common proof, including the crucially-important fifth and eighth factors. There will be some, though not

---

[15]     One of the cases GAS cites in support is *Schwann v. FedEx Ground Package Sys., Inc.*, No. 11-11094-RGS, 2013 WL 1292432, at **2-3 (D. Mass. Apr. 1, 2013), where the court, interpreting Massachusetts law on independent contractor classification, found that individual questions predominated. But under the Massachusetts statute at issue, a worker is deemed an employee unless the employer can show that "the individual *is* free from control and direction in connection with the performance of the service, both under his contract for the performance of service *and in fact*." Mass. Gen. Laws ch. 149, § 148B(1) (emphasis added). In contrast, under Maine law the "test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent." *Murray's Case*, 154 A. 352, 354 (Me. 1931) (internal quotations and citation omitted). Class certification decisions on state law claims are driven by the proof needed to establish liability under that state's laws, and decisions interpreting other states' classification laws may be of limited use in resolving a class certification motion based on Maine's distinct classification standard. In this area, truly "general" rules are hard to come by.

overwhelming, difference among class members on the weighty second factor. There will also be differences on the sixth factor. Looking at the record as a whole, in light of the applicable *Murray's Case* factors, I do not believe that individualized questions will overwhelm common ones, and, accordingly I find that the Plaintiffs have demonstrated predominance.

### 2.   Superiority

The next question is whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Non-exhaustive factors relevant to this determination include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.*

As described above, liability in this case turns on classification. And common proof predominates on whether the workers were employees or independent contractors. So, a class action is a superior method for adjudicating this matter because it will resolve the claims in a single, consolidated proceeding, rather than through a duplicative series of trials.

On the factors set out in Rule 23(b)(3), I find that the class members do not have any interest in individually controlling separate actions. There is no other litigation brought by or against class members concerning this controversy. And while LTNA notes (without citation to the record) that "a majority of potential class

members no longer reside in Maine or work on the project for LTNA," they do not suggest that class members are now concentrated in some other, more convenient forum. *See* LTNA Opp'n 25. Further, because this case involves Maine claims, it makes sense to adjudicate it in a Maine forum. LTNA also suggests that variation in individual damage amounts will make this case difficult to manage as a class action. *See* LTNA Opp'n 25 n.30. But class members recorded their hours on timesheets, so these calculations are possible without individual testimony at trial. *See generally Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003) (discussing how "individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria . . . .").

Finally, class actions are uniquely superior in wage cases, because workers may not feel comfortable suing their employers directly and affirmatively, for fear of compromising how they make their livings. *See Overka v. Am. Airlines, Inc.*, 265 F.R.D. 14, 24 (D. Mass. 2010). And while many class members may have since moved on from the Super Star project, at least at the time depositions were taken, the project was still on-going. GAS Dep. 27:17-20 (explaining that there were approximately 28 workers on the project in February of 2015) (ECF No. 73-1); Cull Dep. 22:23-24 (stating that he was still on the project in May of 2015) (ECF No. 79-10). With a class action, workers will have the option of participating by declining to opt-out, rather than affirmatively opting-in, and thus perhaps enjoy some degree of anonymity with their participation in this suit. I find that a class action is a superior method of resolving this dispute.

## II.     Motion to Decertify the Collective Action

### A.     Legal Standard

Under the Fair Labor Standards Act, similarly situated employees may sue collectively for violations of the rule requiring employers to pay overtime compensation to employees who work more than 40 hours per week.  29 U.S.C. §§ 207, 216(b). The plaintiff bears the burden of showing that the members of the collective are "similarly situated," and that term is neither defined by statute nor elucidated by precedent within this Circuit. In order to assess whether plaintiffs are similarly situated, a three-factor test is generally followed that considers: (1) the factual and employment settings of the individual plaintiffs; (2) the different defenses to which plaintiffs may be subjected on an individual basis; and (3) the degree of fairness and procedural impact of decertification. *Scovil*, 886 F. Supp. 2d at 57; *Prescott v. Prudential Ins. Co.*, 729 F. Supp. 2d 357, 364 (D. Me. 2010). Although plaintiffs are required to be similarly situated to one another, they need not be identically situated. *Scovil*, 886 F. Supp. 2d at 57. "Generally . . . courts have found that similarly situated employees have similar (not identical) job duties and pay provisions, and are victims of a common policy or plan that violated the law." *Prescott*, 729 F. Supp. 2d at 364 (internal citations and quotations omitted).

### B.     Application: Three-Factor Test

#### 1.     Factual and Employment Settings

The Defendants claim that the members of the collective have disparate factual and employment settings. They again marshal record support for their assertions that there are differences in the level of control over individual Plaintiffs, that the

21

Plaintiffs' entrepreneurial opportunities were dissimilar, that the Plaintiffs' investments in tools varied, that the Plaintiffs had differing degrees of skill and initiative, and that the time the Plaintiffs spent working on the project differed from each other both on a daily basis and over the entire term of their work. The Plaintiffs dispute these assertions. Essentially, both sides reiterate the arguments they made under the predominance inquiry of the Rule 23 analysis.

To determine whether an individual is an employee covered by the FLSA or an independent contractor who is not, courts look to the economic realities of the relationship. For this analysis, "[t]he focal point is whether the individual is economically dependent on the business to which he renders service or is, as a matter of economic fact, in business for himself." *Bolduc v. Nat'l Semiconductor Corp.,* 35 F. Supp. 2d 106, 112 (D. Me. 1998). The "economic realities" test looks at many of the same factors used in the *Murray's Case* test:

> 1) the degree of control exercised by the employer over the worker; 2) the worker's opportunity for profit or loss; 3) the worker's investment in the business; 4) the degree of skill and independent initiative required to perform the work; 5) the permanence or duration of the working relationship; and 6) the extent to which the work is an integral part of the employer's business.

*Id.* (citations omitted). The one meaningful difference is that under the *Murray's Case* test courts must assess the employer's "right to control the progress of the work," *Murray's Case,* 154 A. at 354, whereas under the economic realities test, the court examines the actual control exercised by the employer.

At the collective action decertification stage I assess only whether the members of the collective are similarly situated, and I do not reach the underlying merits of

22

the plaintiffs' claims. I have already concluded that common questions predominate over individual ones on the *Murray's Case* factors under Rule 23 class certification analysis, and I will not repeat that analysis where it overlaps with the economic realities factors. But I have yet to analyze evidence of the Defendants' actual control over the workers, so I will address that aspect of the economic realities test here.

The Defendants argue that the level of control they exercised varied substantially from worker to worker. They claim that the opt-in Plaintiffs had different levels of supervision, were on different teams, and did different tasks depending on whether they were team leads, inspectors or mechanics. LTNA acknowledges that it had "overall control" of the project and admits that it provided blueprints and a timeline for completion, but claims that the "actual control" it exercised was limited, and that such control was different depending on team assignment. LTNA Mot. to Decertify 11.  GAS echoes these claims. GAS Mot. to Decertify 6-14. The Plaintiffs respond that GAS hired the workers to provide contract labor, and Joe Lusky from LTNA and Richard Brown from GAS together assigned and reassigned the workers as needed to teams. *See* GAS Dep. 90:12-15 (ECF No. 98-1); Cull Dep. 22:25-23:3 (ECF No. 98-6); Rojas Dep. 54:7-9 (ECF No. 98-7); Ramirez Dep. 24:16-21 (ECF No. 98-9); Lopez Dep. 26:6-25 (ECF No. 98-10). Lusky and Brown chose team leaders and inspectors. GAS Dep. 45:22-47:7 (ECF No. 98-1); LTNA (Lusky) Dep. 42:2-11 (ECF No. 98-11). Workers were intermittently designated team leaders or inspectors and received no additional pay along with these distinctions. Venegas Dep. 217:14-19 (ECF No. 97-2); Huynh Dep. 91:7-19 (ECF No. 97-8).  If

Lusky wanted a worker removed from the project, GAS would terminate the individual. GAS Dep. 42:24-43:7, 47:8-15 (ECF No. 98-1).

Although LTNA personnel may have been at the top of the project's organizational chart and may not have had as much day-to-day oversight over some of the teams, the record shows common evidence on whether LTNA and GAS were actually in control of the project and the workers on it. Providing blueprints, setting a schedule, assigning workers to teams, and doling out tasks all point to common evidence on actual control.

Finally, deciding whether the tasks the workers performed were similar across the collective depends on how closely one zooms in. The fact that some workers were doing door conversion while others were doing wing repairs does not carry the day. All of the collective members were working on LTNA's airplane restoration project at the GAS hangar in Auburn, Maine. Their actual duties, at the micro level, do not need to be identical for the first prong of the similarly situated analysis to be met.

### 2.   Different Defenses

The Defendants assert that the individuals in the collective are subject to different defenses. Both Defendants claim that some workers are subject to a statute of limitations defense. GAS Mot. to Decertify 22; LTNA Mot. to Decertify 21-22. LTNA claims that some workers are more vulnerable to its defense that it was not a joint employer. LTNA Mot. to Decertify 20-21. Both GAS and LTNA claim that the evidence as to whether the opt-in Plaintiffs were misclassified as independent contractors is highly individualized and specific to each opt-in Plaintiff. LTNA Mot. to Decertify 22-24; GAS Mot. to Decertify 16-20.

As Judge Hornby found in *Scovil*, a successful defense on statute of limitations grounds will affect whether a particular plaintiff is included in the collective action, not whether a collective action is appropriate. *Scovil,* 886 F. Supp.2d at 58. As far as the joint employer defense goes, LTNA focuses on supervision and control (one of the four parts of the joint employer test). For the reasons described above with respect to actual control, there is common proof on LTNA's supervision and control over the workers.

Finally, with regard to the idea that the Plaintiffs will be subject to individualized defenses based on their own unique working situations, I agree with Judge Hornby's conclusion in *Scovil* that this argument is dubious. The Defendants characterized all of the workers as independent contractors from the outset. The Defendants would be allowed to present evidence that the individuals classified as independent contractors were not treated uniformly on issues of negotiation, pay, investment in tools, or levels of supervision whether there was a single plaintiff or a class.

> [E]vidence of variation among [workers] is a hallmark of independent contractor status and would be admissible at [the Defendant]'s request even in an individual lawsuit by one [worker], to show that whatever the experience of that individual [worker], he had the opportunity and freedom accorded to an independent contractor, as demonstrated by the experience of his fellows; the variety component is not a dimension added by class action certification.

*Scovil*, 886 F. Supp. 2d at 54.  No individualized defenses have emerged that run counter to the decision to proceed collectively.

### 3.     Fairness and Procedural Impact

As far as fairness is concerned, because the Defendants characterized all the members of the collective as independent contractors, that alone is strong evidence that the Plaintiffs, at least as far as their status is concerned, are similarly situated. *Scovil*, 886 F. Supp. 2d at 55 & n.15, 57 n.18, 58; *Norland v. Caribou Coffee Co., Inc.*, 564 F. Supp. 2d 1010, 1024 (D. Minn. 2007) ("The Court finds it disingenuous for Caribou, on one hand, to collectively and generally decide that all store managers are exempt from overtime compensation without any individualized inquiry, while on the other hand, claiming the plaintiffs cannot proceed collectively to challenge the exemption.")

With regard to procedural impact, although the Defendants claim that the case will devolve into mini-trials, as Judge Hornby points out in *Scovil*, evidence of variation among workers, as an emblem of independent contractor status, would be admissible even if these cases proceeded one-by-one. Given the significant amount of common proof in this case, it would be procedurally expedient to proceed collectively.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Plaintiffs' motion for class certification (ECF No. 73) and **CERTIFIES** a class defined as follows:

> All sheet metal workers and mechanics at any time since June 24, 2009, whom Defendants classified as independent contractors and who worked on Defendants' aircraft restoration project occurring in Auburn, Maine, such that they were not paid for overtime work performed at a rate equal to one and one-half times their regular compensation rate.

The Court **APPOINTS** Plaintiff Venegas as class representative and **APPOINTS** Attorney Woodfield as class counsel. The Plaintiffs are **ORDERED** to file a proposed class notice with the Court within 7 days of the date of this Order. The Defendants will have 7 days to object to the proposed notice. The Court **DENIES** the Defendants' motions to decertify the collective action. (ECF Nos. 94 & 95).

SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 4th day of February, 2016.