## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| CHRISTOPHER VENEGAS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Docket No. 2:14-cv-249-NT |
| | ) | |
| GLOBAL AIRCRAFT SERVICE, INC. | ) | |
| and LUFTHANSA TECHNIK NORTH | ) | |
| AMERICA HOLDING CORP., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

Before the Court is the Defendants' joint motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (ECF No. 100). For the reasons stated below, the Defendants' joint motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

## FACTUAL BACKGROUND

The following facts are based on the parties' joint statement of material facts, which contains all of the parties' statements of facts and responses. At the summary judgment stage, I am obligated to view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013).

## The Parties

**Plaintiffs**

This class/collective action arises out of restoration work being performed on a Lockheed L-1649A Super Star airplane (the "**Super Star**") at the Lewiston-Auburn Municipal Airport in Auburn, Maine. The Plaintiffs are individuals who performed work on the Super Star project.

**Defendant Lufthansa Technik North America Holding Corp.**

Defendant Lufthansa Technik North America Holding Corp. ("**LTNA**") falls within the corporate structure of Deutsche Lufthansa AG ("**Lufthansa**"). Lufthansa "is a global aviation group with approximately 540 subsidiaries, which are organized into five primary business segments: Passenger Airline Group;[1] Logistics; Maintenance, Repair, and Overhaul ("**MRO**"); Catering; and IT Services." Joint Statement of Material Facts and Resp. to Req. to Strike ¶ 1 ("**JSMF**") (ECF No. 121). These business segments are referred to collectively as the "Lufthansa Group," and Lufthansa is the parent company of all Lufthansa Group entities.  JSMF ¶¶ 1-2.

The events leading to this litigation began in December of 2007, when the Deutsche Lufthansa Berlin-Stiftung ("**DLBS**"), which is managed and controlled by Lufthansa, acquired three Super Star airplanes.[2] JSMF ¶¶ 37, 39. DLBS then

---

[1]      The Passenger Airline Group is the largest operating segment in the Lufthansa Group. Joint Statement of Material Facts and Resp. to Req. to Strike ¶ 3 ("**JSMF**") (ECF No. 121). Airlines within the Lufthansa Group include "Lufthansa German Airlines, Swiss International Airlines, and Austrian Airlines." JSMF ¶ 4.

[2]      In January of 2015, ownership of the Super Star transferred from DLBS to Lufthansa Super Star GmbH ("**LSSG**"). JSMF ¶ 38. "LSSG is a wholly-owned subsidiary of Deutsche Lufthansa AG and its supervisory board consists of high level management personnel of Deutsche Lufthansa AG." JSMF ¶ 40.

contracted with Lufthansa Technik AG ("**LHT**") "to overhaul and restore one of the Super Stars to an airworthy condition." JSMF ¶ 37. LHT is a wholly owned subsidiary of Lufthansa, which provides MRO services for civil aircraft. JSMF ¶ 6. LHT provides integral services to the Passenger Airline Group, which is LHT's single largest customer. JSMF ¶¶ 9-10.

Defendant LTNA is a wholly owned and controlled subsidiary of LHT. JSMF ¶ 13. LTNA does not operate any aircraft itself. JSMF ¶ 105; Defs.' Resp. to Pls.' Statement of Material Fact ¶ 105 ("**DRPSMF**"). Instead, LTNA performs MRO work on "the aircraft and components used by Lufthansa German Airlines, . . . airlines that are under common control by Deutsche Lufthansa AG, and other external airlines." JSMF ¶ 14. MRO "are functions traditionally performed by airline employees in the aircraft industry." JSMF ¶ 53. The majority of LTNA's MRO work is performed for passenger and freight airlines through LTNA's Federal Airline Regulation Part 145 Repair Stations, which are located in Maine, California, Florida, Oklahoma, and Puerto Rico. JSMF ¶¶ 15-16.

## Defendant Global Aircraft Services, Inc.

Defendant Global Aircraft Services, Inc. ("**GAS**") is a Texas repair company that services, maintains, and repairs aircraft fuel systems. JSMF ¶ 83; Ex. 6 to Loc. Rule 56(h) Stip. Rec. ¶ 2 ("**Ex. 6**") (ECF No. 122-6). Like LTNA, GAS does not operate any commercial flights. JSMF ¶ 106.

### The Super Star Project

In September of 2009, LTNA retained GAS "to deseal, change fasteners and dome nuts, and reseal the wings of the Super Star." JSMF ¶ 80; Ex. 6, ¶ 3. After GAS

was retained, however, "it became clear that the extent of the corrosion on other portions of the aircraft required more work than GAS was able to provide." JSMF ¶ 81. Accordingly, LTNA requested that GAS "identify and supply sheet metal contractors to perform repairs outside the fuel system." JSMF ¶ 82. "Although GAS's ordinary business was limited to fuel systems, it agreed to use its own repair-station license and contacts in the industry to refer contractors to the Super Star project." JSMF ¶ 83.

The referred contractors all signed the same agreement with GAS to work as independent contractors restoring the Super Star at an hourly rate. Ex. 3 to Loc. Rule 56(h) Stip. Rec. 57:10-20; 58:6-9 ("**Ex. 3**") (ECF No. 122-3). Christopher Venegas, the named Plaintiff, began working on the Super Star project in early 2013. Ex. 11 to Loc. Rule 56(h) Stip. Rec. ¶ 3 ("**Ex. 11**") (ECF No. 122-11).

The project involves the restoration of the Super Star at LTNA's Auburn, Maine Repair Station, which is located on the grounds of the Auburn-Lewiston Airport. JSMF ¶¶ 47-48. The Super Star "is being modified to meet current FAA standards for passenger safety." JSMF ¶ 54. Accordingly, the work "is highly regulated by the FAA." JSMF ¶ 85. While the work was initially performed through GAS's FAA Repair Station authorization, the FAA required LTNA to have its own Repair Station Certificate in 2010. JSMF ¶ 49. As the holder of an Air Agency Certificate, LTNA must comply with "the requirements of the Federal Aviation Regulations relating to the establishment of an Air Agency and Repair Station." JSMF ¶ 51. Thus, LTNA's Director of Maintenance for the project "is responsible for

the overall operation of the Repair Station[,]" including "directing, planning, and laying out the details of inspection standards, methods, and procedures used by the repair station in complying with all applicable Federal Aviation Regulations." JSMF ¶¶ 55-56.

The discovery of hidden damage on the Super Star has extended the project five years past its anticipated end date. JSMF ¶ 66. The Super Star itself has not flown in at least ten years, and the restoration project has now been ongoing for seven years. JSMF ¶¶ 108, 111. The Plaintiffs in this case have worked on the Super Star project only at the Auburn-Lewiston Airport. JSMF ¶ 109. And LTNA has not performed any additional work at the Auburn-Lewiston Airport beyond working on the Super Star. JSMF ¶ 110.

The majority of the work on the Super Star is performed by workers designated as independent contractors, although there are some LTNA employees who work on the project. *See* JSMF ¶ 58. For his part, Venegas "worked on fabricating parts, constructing the frame, installing various parts, and inspecting parts that would be installed on the Super Star." JSMF ¶ 65. Although the type of sheet metal work done on the Super Star was typical of the type of work airlines perform to maintain passenger and cargo aircraft, the licensing requirements were different.[3] Workers on the Super Star project did not need an Airframe and Power Plant license, which would

---

[3]    Although the Plaintiffs deny that the type of work they were doing is similar to maintenance work that would occur for scheduled maintenance, the only difference they raise is the license requirement. Pls.' Resp. to Defs.' Statement of Material Fact ¶ 63 ("**PRDSMF**"); Pls.' Resp. to Defs.' Reply Statement of Material fact ¶ 116 ("**PRDRSMF**"). Based on Cull's deposition, individual workers are not required to have Airframe and Power Plant licenses if they are working for a licensed repair station. Cull Dep. Tr. 48:4-25; 49:1-16 (ECF No. 122-14). LTNA was a licensed repair station.

be required if the work were performed for an airline. Pls.' Resp. to Defs.' Statement of Material Fact ¶ 63 ("**PRDSMF**"); Pls.' Resp. to Defs.' Reply Statement of Material fact ¶ 116 ("**PRDRSMF**"). "GAS's job advertisement for 'Aircraft Sheet Metal Contractors' states that an Airframe and Power Plant license is not required." PRDSMF ¶ 63.

### The Super Star's Intended Use

Lufthansa, DLBS and LSSG "are restoring the Super Star aircraft to meet current FAA-standards for passenger service."[4] JSMF ¶ 42. "Once the full restoration

---

[4]      Paragraphs 41 through 45 of the Defendants' Joint Statement of Material Facts describe Lufthansa's intended uses for the renovated Super Star once it becomes flight worthy. *See* PRDSMF ¶¶ 41-45. The Plaintiffs deny portions of these paragraphs referring to a Declaration of Andrew Howell, which describes a website that Howell states he accessed on November 9, 2015. Nov. 19, 2015 Howell Decl. ¶¶ 6-8. ("**Howell Decl.**") (ECF No. 122-12). The website, according to Howell, is "operated and published by the Lufthansa Group." Howell Decl. ¶ 6. Howell printed the website page as a PDF and attached it as Exhibit A to his declaration. Howell Decl. ¶ 7. The website page purports to depict the number of commercial aircraft in the Lufthansa Group's fleet as of 2013. The makeup of the Lufthansa Group's fleet in 2013 does not contradict the Defendants' factual assertions regarding how the Super Star will be used in the future once it is fully restored. Because paragraphs 41-45 have not been properly controverted, they are deemed admitted. *See* Local Rule 56(f).

     Plaintiffs repeat the facts asserted in the Howell Declaration in paragraphs 112 through 115 of their Statement of Additional Material Facts in Support of Plaintiffs' Opposition to the Defendants' Motion for Summary Judgment. The Defendants qualify these paragraphs and request to strike them. The parties elaborate on their positions in the briefing supporting the Defendants' Joint Motion for Leave to File Motion to Strike. (ECF Nos. 120, 123 & 124). The Defendants posit that Exhibit A constitutes inadmissible hearsay. The Plaintiffs make two arguments that the website content is admissible. First, they contend that the website page is not hearsay under Rule 801(d)(2)(C) because Andreas Pakszies, an employee of Lufthansa Technik AG, has been authorized to make statements on behalf of Lufthansa Technik AG and Lufthansa. But there is nothing suggesting that Pakszies made the statements on the website print-out at issue or that a party to this lawsuit authorized the statement on the website. Second, they contend that the statements on the website should be attributed to LTNA under Rule 801(d)(2)(D) because Lufthansa is LTNA's parent corporation. Plaintiffs rely on *Big Apple BMW, Inc. v. BMW of North America, Inc*., in which the Third Circuit held that "[t]he statement of a subsidiary may be attributed to its corporate parent, consistent with agency theory, where the parent dominates the activities of the subsidiary." 974 F.2d 1358, 1373 (3d Cir. 1992). Unlike *Big Apple BMW*, the Plaintiffs are attempting to use the statements of a corporate parent against a subsidiary. Even if it is appropriate to attribute statements of a corporate parent to a subsidiary based on an agency theory, the Plaintiffs, as proponents of the disputed evidence, must show that Lufthansa was LTNA's agent and that the statements were made within the scope of their agency relationship. *See Aumand v. Dartmouth Hitchcock Med. Ctr.*, 611 F. Supp. 2d 78, 93 (D.N.H. 2009) ("The proponent of a statement as an admission by an agent within the scope of his employment

is complete, the Super Star will provide paying passengers with a unique service of traveling on one of Deutsche Lufthansa AG's fleet of vintage aircraft, flying both national and international routes." JSMF ¶ 43. Flights on the Super Star will operate as airplanes did in the 1950s—at half the speed and half the altitude of today's commercial airliners—"providing passengers with a unique perspective of the landscapes below." JSMF ¶ 44. "The Super Star will also be presented at airshows and exhibitions." JSMF ¶ 45. And ticket prices for flights on the Super Star "will be priced on the basis of a break-even policy to directly support the maintenance of the plane." JSMF ¶ 46.

### The Consequences of Reclassifying the Plaintiffs as Employees

LTNA's employees are eligible for several different programs, benefits, and plans through its parent company LHT. JSMF ¶¶ 17, 21-31. Examples of benefits include membership in different plans, such as medical, dental, life, accidental death/dismemberment, disability, and flexible spending accounts. JSMF ¶ 18. LTNA offers its employees three choices for health insurance with resulting contributions from LTNA/LHT, depending on the selected coverage. JSMF ¶¶ 19-20. After three months of employment, LTNA employees can participate in LTNA's 401(k) Plan "which provides a 2% contribution above what the employee contributes up to 7%." JSMF ¶ 26. Employees also receive flight privileges, including reduced-fares on "Lufthansa, Star Alliance, and ZED Partners" flights. JSMF ¶ 32. "Immediate family

---

bears the burden of showing both the existence and scope of the relationship."). The Plaintiffs have not made this showing. Thus, I grant the Defendants' requests to strike paragraphs 112 through 115 and **DENY AS MOOT** the Defendants' Joint Motion for Leave to File Motion to Strike.

members, companions, and a limited number of friends can accompany the LTNA employee on these trips." JSMF ¶ 32. In all, these benefits are "estimated to increase LTNA's costs of employment on average of 30-40% above the employee's regular pay." JSMF ¶ 33. Each contractor working on the Super Star project would be entitled to these benefits if they were classified as LTNA employees. JSMF ¶ 69.

Given the higher costs LTNA spends on employees, reclassifying all of the workers on the Super Star project would impact the project itself and the way that LTNA conducts its business. JSMF 68.[5]  It is anticipated that reclassification would make it difficult to engage a sufficient number of workers to meet the Super Star's production schedule. JSMF ¶ 71; PRDSMF ¶ 71. And because of the unexpected costs that have already been incurred in restoring the Super Star, it is "foreseeable that requiring LTNA to reclassify all workers on the project as LTNA's employees would put the completion of the Super Star project in jeopardy." JSMF ¶ 74.[6] On the other hand, if the project is completed, ticket prices for passengers may be adjusted due to

---

[5]     The Plaintiffs denied this statement of material fact. In support of their denial, the Plaintiffs cite the declaration of Andreas Pakszies, senior project manager for the Super Star project, for the proposition that "ticket prices on the completed Super Star will be adjusted to support maintenance of the plane." PRDSMF ¶ 68. The fact that "ticket prices on the completed Super Star will be adjusted to support maintenance of the plane" does not controvert LTNA's assertion that reclassification will have consequences for the Super Star project itself. Thus, the fact is deemed admitted under Local Rule 56(f).

[6]     The Plaintiffs denied this statement of material fact. In support of their denial, the Plaintiffs again cite the Pakszies declaration for the proposition that "ticket prices on the completed Super Star will be adjusted to support maintenance of the plane." PRDSMF ¶ 68. The fact that "ticket prices on the completed Super Star will be adjusted to support maintenance of the plane" does not controvert the asserted fact that reclassification could jeopardize the project. The point of the Defendants' asserted fact is to show that reclassification may prevent the Super Star from ever being completed. Because the Plaintiffs' denial does not controvert the Defendants' statement of material fact, the fact is deemed admitted.

the higher costs associated with the project and the completed Super Star's ongoing maintenance. JSMF ¶ 75; PRDSMF ¶ 75.

The "costs generated during the overhaul of the Super Star" are invoiced to DLBS and LSSG. JSMF ¶ 76. Because of DLBS and LSSG's relationship with Lufthansa, increased costs from the Super Star project could potentially be borne by all entities in the Lufthansa Group. JSMF ¶ 76.[7] There is also a chance that increased costs could be passed on to external airlines served by LTNA. JSMF ¶ 78.[8] GAS claims it would not have sent the contractors to Maine to work on the Super Star project if it had been required to classify them as employees. JSMF ¶¶ 72, 102. Plaintiffs counter that GAS had not employed any workers as independent contractors before its contract with LTNA and that GAS sent both employees and independent contractors to Maine. PRDSMF ¶¶ 72, 102.

## PROCEDURAL HISTORY

Plaintiff Venegas filed suit in 2014 on behalf of himself and other workers on the Super Star project alleging violations of federal and Maine wage and hour laws. Compl. ¶¶ 62-69 (ECF No. 1). The crux of Venegas's claims is that GAS and LTNA (collectively, the "**Defendants**") misclassified him and other workers as independent contractors, meaning they were not paid all legally-required wages. Compl. ¶¶ 63-64, 66-68. In early 2015, I conditionally certified a group of metal workers on the Super

---

[7]     The Plaintiffs' denial does not controvert the asserted fact and is deemed admitted under Local Rule 56(f).

[8]     The Plaintiffs' denial does not controvert the asserted fact and is deemed admitted under Local Rule 56(f).

Star project as a collective action under the federal Fair Labor Standards Act. Order on Pl.'s Mot. for Conditional Certification 8-9 (ECF No. 56).

Then, on February 4, 2016, I granted the Plaintiffs' motion for class certification with respect to their state law claims[9] and denied the Defendants' motions for collective action decertification with respect to the Plaintiffs' federal claims. Order on Pls.' Mot. for Class Certification 1 (ECF No. 126). Both of the Defendants have filed petitions for permission to appeal this Order pursuant to Federal Rule of Civil Procedure 23(f) with the United States Court of Appeals for the First Circuit. The First Circuit has not yet ruled on the petitions.[10] For purposes of this summary judgment motion only, the Defendants have assumed that the Plaintiffs are employees under both state and federal law. Joint Mot. for Summ. J. 2 n.2.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "A dispute is genuine if the evidence about the fact is such that

---

[9]    The certified class is defined as:

   All sheet metal workers and mechanics at any time since June 24, 2009, whom Defendants classified as independent contractors and who worked on Defendants' aircraft restoration project occurring in Auburn, Maine, such that they were not paid for overtime work performed at a rate equal to one and one-half times their regular compensation rate.

Order on Pls.' Mot. for Class Certification 26 (ECF No. 126).

[10]    An appeal from a class-action certification "does not stay proceedings in the district court unless the district judge or the court of appeals so orders." Fed. R. Civ. P. 23(f).

a reasonable jury could resolve the point in favor of the non-moving party." *Johnson*, 714 F.3d at 52 (citation and quotations omitted). "A fact is material if it has potential to determine the outcome of the litigation." *Id.*

## DISCUSSION

The Plaintiffs' Complaint is twofold. In Count I, the Plaintiffs claim that the Defendants failed to pay them proper wages under 26 M.R.S.A. §§ 663, 664, 760. Compl. ¶¶ 62-64. The Defendants maintain that these state law claims are preempted by the Airline Deregulation Act (the "**ADA**"). 49 U.S.C. § 41713. In Count II, the Plaintiffs claim that the Defendants violated the Fair Labor Standards Act of 1938 (the "**FLSA**") by failing to pay them overtime wages. 29 U.S.C. § 201; Compl. ¶¶ 65-69. The Defendants contend that they are exempt from paying overtime wages under the FLSA because they are subject to the Railway Labor Act (the "**RLA**"). 45 U.S.C. § 151. I address whether summary judgment is appropriate as to each claim below beginning with Count II.

## I.    Railway Labor Act Exemption—Count II

### A.    Overview of Railway Labor Act

Under § 207 of the FLSA, the general rule is that an employee must be paid at a rate of one and one-half times the employee's regular pay for all hours worked in excess of 40 hours in a given workweek. 29 U.S.C. § 207. There are exceptions to the general rule, *see* 29 U.S.C. § 213, but "exemptions [are] 'narrowly construed against the employers seeking to assert them,' " and the "burden is on the employer to prove an exemption from the FLSA's requirements." *Marzuq v. Cadete Enter., Inc.*, 807 F.3d

11

431, 438 (1st Cir. 2015) (quoting *Reich v. John Alden Life Ins. Co*., 126 F.3d 1, 7 (1st Cir. 1997)).

Section § 213(b)(3) of the FLSA provides an exemption for "any employee of a carrier by air subject to the provisions of title II of the Railway Labor Act." Accordingly, if the Defendants are carriers by air, and thus subject to the RLA, the FLSA's overtime requirements do not apply.

The RLA "creates a special scheme to govern the labor relations of railroads and airlines because of their unique role in serving the traveling and shipping public in interstate commerce." *Verrett v. SABRE Grp., Inc.*, 70 F. Supp. 2d 1277, 1281 (N.D. Okla. 1999). One of the purposes of the RLA is to provide mechanisms for the resolution of labor disputes. 45 U.S.C. § 151a. Parties subject to the RLA must utilize its dispute resolution processes "before resorting to self-help." *Cunningham v. Elec. Data Sys. Corp.*, No. 06-cv-3530-RJH, 2010 WL 1223084, at *3 (S.D.N.Y. Mar. 30, 2010) [hereinafter *Cunningham II*].

Although the RLA was initially limited to railroads, it was amended in 1936 to include air carriers. The RLA applies to:

> [E]very common carrier by air engaged in interstate or foreign commerce . . . and every air pilot or other person who performs any work as an employee or subordinate official of such carrier or carriers, subject to its or their continuing authority to supervise and direct the manner of rendition of his service.

45 U.S.C. § 181. The RLA defines "carrier" broadly to include the carrier itself "and *any company which is directly or indirectly owned or controlled by or under common control with any carrier* . . . ." 45 U.S.C. § 151, First. (emphasis added). Entities that do not operate aircraft, sometimes referred to as derivative carriers or carrier

affiliates, can be subject to the RLA if they are sufficiently connected to air carriers. "When the activities of carrier affiliates are necessary to the operations of an air carrier, and a labor dispute at the affiliate could cripple airline operations, those affiliates must be subject to the RLA because such disruption is the very type of interruption to air commerce the RLA was designed to prevent." *Verrett*, 70 F. Supp. 2d at 1281.

To determine whether an employer and its employees are subject to the RLA when the employer itself is not engaged in the common carriage of passengers by air, the National Mediation Board ("**NMB**")[11] applies a two-part test:

> First, the NMB determines whether the nature of the work is that traditionally performed by employees of rail or air carriers—the function test. Second, the NMB determines whether the employer is directly or indirectly owned or controlled by, or under common control with, a carrier or carriers—the control test.

*In re Int'l Cargo Mktg. Consultants*, 31 NMB 396, 406 (June 18, 2004).[12] "Both prongs must be satisfied in order for the RLA exemption to apply." *Roca v. Alphatech Aviation Servs., Inc.*, 960 F. Supp. 2d 1368, 1372 (S.D. Fla. 2013). Accordingly, summary judgment is proper if the Defendants have produced enough undisputed evidence to satisfy both prongs of this test.

---

[11]    The NMB is the federal agency in charge of labor-management relations under the RLA. *Cunningham v. Elec. Data Sys. Corp.*, No. 06-cv-3530-RJH, 2010 WL 1223084, at *4 (S.D.N.Y. Mar. 30, 2010) [hereinafter *Cunningham II*]. Courts generally defer to the NMB's construction of the law. *See Cunningham v. Elec. Data Sys. Corp.*, 579 F. Supp. 2d 538, 542 (S.D.N.Y. 2008) [hereinafter *Cunningham I*].

[12]    "While lower courts have adopted the NMB's function-and-control test and treat NMB analyses of the test [as] persuasive in certain instances, courts are not bound by the categorical determinations made by the NMB under this test." *Roca v. Alphatech Aviation Servs., Inc.*, 960 F. Supp. 2d 1368, 1372 n.2 (S.D. Fla. 2013).

### B.     Analysis

Under the function test, "[t]he controlling inquiry is 'whether the nature of the work is that traditionally performed by employees of rail or air carriers.'" *Cunningham II*, 2010 WL 1223084, at *5 (quoting *In re Int'l Cargo*, 31 NMB at 406). "[W]hen considering whether the nature of the work is traditionally performed by employees of rail or air carriers[,]" the NMB "looks to the [RLA's] purposes." *In Re AMR Servs. Corp.*, 18 NMB 348, 350 (May 2, 1991). Because one of the RLA's stated purposes is to "avoid any interruption to commerce or to the operation of any carrier engaged therein," 45 U.S.C. § 151a, the analysis under the first prong also examines "whether the carrier affiliate's services are sufficiently connected to the carrier's commercial transportation operations that a work stoppage at the carrier affiliate would impede those operations." *Cunningham II*, 2010 WL 1223084, at *5. In other words, the function test considers whether the work at issue is traditionally performed by employees of air carriers and also whether the work is essential to a carrier's air transportation services. *See Verrett*, 70 F. Supp. 2d at 1283; *see also In re Norwegian Cabin Crew Assoc.*, 43 NMB 97, 105 (April 19, 2016) (holding that the function test is satisfied where "[t]he duties of flight attendants are essential to air transportation services and have been long held to be services traditionally performed by carrier employees").

The function prong analysis is not confined to the services provided by an employer generally, but rather considers the work performed by the *employees at*

issue.[13] *In re Norwegian Cabin Crew Assoc.*, 43 NMB at 104 ("The Board considers an entity to be a derivative carrier and covered by the RLA if the employees at issue render a service traditionally performed by carrier employees . . . ."). Moreover, because "[t]he NMB has long held that the RLA deals with the present status and present interest of employees[,]" the inquiry centers on the current state of affairs. *In re Argenbright Sec., Inc.*, 29 NMB 332, 337 (June 13, 2002).

The NMB has found that a wide variety of work is traditionally performed by employees of air carriers, such as maintenance and janitorial work at an air carrier's buildings, *In re Int. Total Servs./Servs. & Sys. LTD.*, 9 NMB 392 (May 24, 1982), and transportation services for aircraft crew members between airports and hotels, *In re Milepost Indus.*, 27 NMB 362 (May 9, 2000). Moreover, as the Defendants point out, the "NMB has consistently held that repair, servicing, and overhaul of aircraft is 'work traditionally performed by employees in the airline industry.' " Joint Motion for Summ. J. 4 (ECF No. 100) (quoting *In re Dalfort Aerospace, L.P.*, 27 NMB 196, 211 (Feb. 3, 2000)). A litany of NMB decisions support this position. *See* Joint Mot. for Summ. J. 4-5 (citing cases). With this framework in mind, I turn to the parties' contentions.

The Defendants contend that the workers on the Super Star perform work traditionally performed in the airline industry.  Defs.' Joint Motion for Summ. J. 5. It is undisputed that "[m]aintenance, repair, and overhaul are functions traditionally

---

[13]     LTNA's assertion that the inquiry under the function prong is strictly limited to "whether the employer provides services that are traditionally performed by air carriers, not the work of the employees at issue[,]" is incorrect. LTNA's Reply to Pls.' Opp'n 2-3 ("**LTNA's Reply**") (ECF No. 119).

performed by airline employees in the aircraft industry." JSMF ¶ 53. The type of sheet metal work that the Plaintiffs are performing is typical of the type of work airlines do to maintain passenger and cargo aircraft, although licensing requirements are different. JSMF ¶ 116; PRDRSMF ¶ 116.

The Plaintiffs accept that "repair and maintenance is typically performed by many employees of common carriers," but contend that their MRO work is unique because "the essence of the work . . . is to restore a nostalgic airplane to airworthy condition so that Lufthansa may exhibit it and entertain on it." Pls.' Opp'n to Defs.' Joint Motion for Summ. J. 10-11 ("**Pls.' Opp'n**") (ECF No. 115). The Plaintiffs point out that they have worked only on the restoration of the Super Star aircraft, which has been ongoing for seven years, that the Super Star has not flown in at least ten years, and that their "work is performed on an extended basis, not between flights." Pl.'s Opp'n 9.

Viewing the facts in the light most favorable to the Plaintiffs, a rational juror could conclude that the work performed on this particular project goes well beyond typical maintenance and repair and even beyond overhaul services typically performed on aircraft. It is possible to view the complete retrofitting of the Super Star as closer to the manufacture of a new aircraft than it is to routine maintenance of an older plane. The Defendants have not pointed to any authority[14] establishing that it

---

[14]    The closest case cited by the Defendants, *In Re Empire Aero Center, Inc.*, 33 NMB 3 (Oct. 13, 2005), is distinguishable. Empire was an MRO contractor that worked on a variety of different aircraft. The duration of Empire's MRO work "depend[ed] on the type of aircraft and the MRO required, and [could] range from one to four days at the basic level to three months or longer at the highest level." *Id*. at 5. The workers at issue there conceded that the work they performed was work traditionally performed by employees in the airline industry. *Id*. at 9.

is typical for employees of air carriers to perform MRO work for over seven years on the same aircraft. Considering the extent of the project, there is a material dispute over whether the work at issue is traditionally performed by employees of air carriers.

The function test also analyzes whether the affiliate carrier's services are essential to an air carrier's transportation operation.[15] *See Cunningham II*, 2010 WL 1223084, at *5; *see also In re Norwegian Cabin Crew Assoc.*, 43 NMB at 105; *In Re Milepost Indus.*, 27 NMB 362, 366 (May 9, 2000). In *Verrett*, the court held that the affiliate carrier SABRE satisfied the function test because its "specialized information technology services for airline flight operations, airport passenger processing, crew scheduling, passenger reservations, accounting and related functions for [the carrier] and other airlines are an integral part of the air carriers' transportation function." 70 F. Supp. 2d at 1282. The court found that, absent these specialized services, "[a]irline operations would cease" because the employees' work was "critical to airline functions such as flight operations and scheduling" that "any job action by SABRE employees, however slight, would disrupt the operations, and possibly imperil the safety of these airlines." *Id*. Similarly, in *Cunningham II*, the facts established that the employer's "IT services touch[ed] upon virtually every area of [the carrier's] business, including flight planning and operations, pilot communications, in-flight catering, airplane maintenance, flight reservations" and

---

[15]     Defendants cite *Moyano v. Prof'l Contractors Servs., Inc*., No. 1:07–cv–22411 (S.D.Fla. Mar. 7, 2008) in support of their argument. *Moyano*, however, does not inquire into whether the services at issue are integral to the continued operation of an air carrier. *Moyano* provides minimal analysis on either prong. I find the analysis utilized in *Verrett* and *Cunningham II* more persuasive.

other areas. 2010 WL 1223084, at *5 n.2 (internal quotation marks omitted). As a result, the court held that the function test was satisfied because the employer's services were "crucial to the airline's commercial operations." *Id.* at *5.

Neither LTNA nor GAS has directed the Court to anything in the record establishing that their services are crucial to the continued operation of an air carrier. Although the record does reflect that LHT's "services are integral to the reliable performance of the Passenger Airline Group's aircraft operations[,]" it is silent with respect to the significance of LTNA's services on this project to the Passenger Airline Group's continued operation. *See* JSMF ¶ 9. Likewise, GAS has not pointed to anything in the record demonstrating that its services are vital to air transportation.

Indeed, the evidence depicting the extent of the Defendants' relationships with air carriers is scant, particularly when examined in light of the factual circumstances in *Verrett* and *Cunningham II*. Unlike the employers in those cases, the undisputed facts do not establish that airline operations would cease without the Defendants' services, *Verrett*, 70 F. Supp. 2d at 1283, or that their services "are crucial to [an] airline's commercial operations." *Cunningham II*, 2010 WL 1223084, at *5. And there is no suggestion that any job action by the Plaintiffs, "however slight, would disrupt the operations, and possibly imperil the safety of" any airline. *Verrett*, 70 F. Supp. 2d at 1282. To the contrary, the facts show that the Defendants have been working for seven years to restore an aircraft (which has not flown for at least ten years) at the Auburn-Lewiston Airport. JSMF ¶¶ 108, 111. Although the purpose of the Super Star Project is to restore the aircraft to airworthy condition so that it can eventually

18

become a part of Lufthansa's fleet, at present, the project is too attenuated from its intended future purpose to be considered "absolutely integral" to continued air transportation operations. *Verrett*, 70 F. Supp. 2d at 1283.

In addition, there is a line of federal cases holding that an air carrier's employees must have "more than a tenuous, negligible and remote relationship to the transportation activities" of the carrier in order to fall under the RLA. *Nw. Airlines Inc. v. Jackson*, 185 F.2d 74, 77 (8th Cir. 1950) (internal quotations omitted); *see also Slavens v. Scenic Aviation, Inc.,* 221 F.3d 1353 (10th Cir. 2000) ("The RLA was not intended to apply to all types of work, regardless of the connection to transportation, just because the company conducting the work performed some carrier activities within its company functions."). For example, in *Northwest Airlines*, the United States Court of Appeals for the Eighth Circuit held that the defendant Northwest Airlines' employees who modified military aircraft at the defendant's modification center, were not exempt from the FLSA because they were "not directly engaged in defendant's air transportation activities." 185 F.2d at 77. Adopting the trial court's rationale, the appeals court reasoned that the RLA "was intended to apply only to transportation activities and that work which bears more than a tenuous, negligible and remote relationship to the transportation activities. It was not intended to apply to all work, regardless of its connection to transportation . . . ." *Id.* Accordingly, because the modification work performed by the employees had such a tenuous connection to the defendant-carrier's transportation activities, the RLA did not apply. *Id.* at 77-78.

LTNA acknowledges this line of cases, but contends that the Plaintiffs' "work returning the Super Star to airworthy condition is flight related." LTNA's Reply to Pls.' Opp'n 3 n.2 ("**LTNA's Reply**") (ECF No. 119). LTNA paints with too broad a brush. The inquiry is not whether the employees' work is "flight related," but rather whether the work bears "more than a tenuous, remote or negligible relationship *to the regular transportation activities of the carrier-employer*." *Marshall v. Pan Am. World Airways, Inc.*, No. 75-394-ORL-CIV, 1977 WL 1772, at *5 (M.D. Fla. Aug. 8, 1977) (emphasis added) (citing *Nw. Airlines, Inc.*, 185 F.2d at 77).

The purpose of the RLA "is to keep transportation moving." *Pan Am. World Airways, Inc. v. United Bhd. of Carpenters & Joiners of Am.*, 324 F.2d 217, 220 (9th Cir. 1963). Thus, the work at issue must be sufficiently related to the regular transportation services offered by an air carrier in order to fall under the RLA. Given that the Plaintiffs have only worked on the Super Star restoration (a project that has been ongoing for seven years) and that the Super Star has not flown in at least ten years, a jury could reasonably find that the work at issue here is too far removed from regular transportation activities to be covered by the RLA. *See* JSMF ¶¶ 108, 111.

Because a genuine dispute of material fact exists as to whether the work at issue is traditionally performed by employees of air carriers and the affiliate carrier's services are essential to an air carrier's transportation operation, the Defendants have not satisfied the function prong of the RLA exemption test. Accordingly, Defendant's motion for summary judgment on the Plaintiffs' FLSA claim is denied.

## II.    Airline Deregulation Act Preemption—Count I

The Defendants maintain that the Plaintiffs' claims for overtime pay under Maine law are preempted by the ADA. Joint Mot. for Summ. J. 11. A brief overview of the ADA sets the stage for this analysis.

### A.    Overview of the Airline Deregulation Act[16]

Preemption analysis begins with the Supremacy Clause. *Brown v. United Airlines, Inc.*, 720 F.3d 60, 63 (1st Cir. 2013). Because the Supremacy Clause states that federal law is the "supreme Law of the Land[,]" U.S. Const. Art. VI, cl. 2, it "nullifies state laws that 'interfere with, or are contrary to' federal laws enacted by Congress." *Bower v. Egyptair Airlines Co.*, 731 F.3d 85, 92 (1st Cir. 2013) (quoting *Gibbons v. Ogden*, 22 U.S. 1, 82 (1824)). "Preemption may be express or implied." *Tobin v. Fed. Exp. Corp.*, 775 F.3d 448, 452 (1st Cir. 2014).

The ADA was enacted in 1978 "as part of a wave of deregulatory measures" aimed at lowering prices through competitive market forces. *DiFiore v. Am. Airlines, Inc.*, 646 F.3d 81, 85 (1st Cir. 2011); *see also Overka v. Am. Airlines, Inc.*, 790 F.3d 36, 37 (1st Cir. 2015) ("The ADA sought to promote efficiency, innovation, and low prices in the airline industry through maximum reliance on competitive market forces and on actual and potential competition." (citation and quotations omitted)). "To assure

---

[16]    Following the parties' lead, I rely on case law interpreting both the Airline Deregulation Act (the "**ADA**") and the Federal Aviation Administration Authorization Act (the "**FAAAA**"), as "[t]he FAAAA's preemption provision is in pertinent part identical to the preemption provision of the ADA and is generally construed in pari materia." *Tobin v. Fed. Exp. Corp.*, 775 F.3d 448, 454 n.4 (1st. Cir. 2014).

that the new regime was not trammeled by state re-regulation," *DiFiore,* 646 F.3d at

85, Congress included an express preemption provision, which currently states that:

> Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C. § 41713(b)(1).

The Supreme Court has consistently endorsed a broad reading of the ADA's

preemption provision. In *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992),

the Court held:

> (1) that "[s]tate enforcement actions having a connection with, or reference to," carrier "rates, routes, or services' are pre-empted," (2) that such pre-emption may occur even if a state law's effect on rates, routes, or services "is only indirect," (3) that, in respect to pre-emption, it makes no difference whether a state law is "consistent" or "inconsistent" with federal regulation, and (4) that pre-emption occurs at least where state laws have a "significant impact" related to Congress' deregulatory and pre-emption-related objectives.

*Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 370-71 (2008) (quoting

*Morales*, 504 U.S. at 378, 384, 386-87, 390) (internal citations omitted). But the Court

did note that " '[s]ome state actions may affect [airline fares] in too tenuous, remote,

or peripheral a manner' to have pre-emptive effect." *Morales*, 504 U.S. at 390

(alteration in original) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21

(1983)).

The Court reaffirmed its broad interpretation of ADA preemption in *American

Airlines, Inc., v. Wolens*, holding that claims brought under a state consumer

protection law were preempted, although claims for breach of contract were not. 513

U.S. 219, 225 (1995). And more recently, in *Northwest, Inc. v. Ginsberg*, the Court held that the ADA preempted a state law claim for breach of the implied covenant of good faith and fair dealing. 134 S. Ct. 1422, 1433 (2014). The Court found that the claim—which sought the plaintiff's "reinstatement in Northwest's frequent flyer program"—was connected to an airline's prices and services. *Id.* at 1430. Writing for the unanimous Court, Justice Alito explained:

> Like the frequent flyer program in *Wolens*, the Northwest program is connected to the airline's "rates" because the program awards mileage credits that can be redeemed for tickets and upgrades. When miles are used in this way, the rate that a customer pays, *i.e.*, the price of a particular ticket, is either eliminated or reduced. The program is also connected to "services," *i.e.*, access to flights and to higher service categories.

*Id.* at 1431 (citation omitted). Accordingly, the claim was preempted by the ADA.

Given the text of the ADA and the Supreme Court case law interpreting it, the First Circuit has broken down the preemption analysis into two parts: "the 'mechanism' question and the 'linkage' question." *Tobin*, 775 F.3d at 453 (quoting *Brown*, 720 F.3d at 63). The mechanism question asks "whether the arguably preempted claim is based on a state 'law, regulation, or other provision having the force and effect of law.'" *Brown*, 720 F.3d at 63. If the answer to the mechanism question is yes, then the linkage question "asks whether the claim is sufficiently 'related to' an air carrier's prices, routes, or services to warrant preemption." *Tobin*, 775 F.3d at 453.

In considering the linkage question, courts must be mindful that "[t]he Supreme Court has instructed that the 'related to' language of the ADA is meant to be construed broadly, consistent with Congress's intention that ADA preemption

23

should have an expansive reach." *Id.* at 454 (citing *Morales*, 504 U.S. at 383-84). The ADA preempts any state law claim "having 'connection with, or reference to,' an airline's prices, routes, or services." *Id.* (quoting *Morales*, 504 U.S. at 384). Preemption can "occur even if a state law's effect on rates, routes, or services is only indirect, and applies at least where state laws have a significant impact related to Congress' deregulatory and pre-emption-related objectives." *Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 436 (1st Cir. 2016) (citation and quotations omitted).

Because "countless state laws have *some* relation to the operations of airlines and thus *some* potential effect on the prices charged or services provided[,]" there is a limit to the ADA's preemptive scope. *DiFiore*, 646 F.3d at 86. The connection "cannot be de minimis: the challenged law must have a 'forbidden significant effect' on prices, routes, or services in order to fall under the ADA's protective carapace." *Tobin*, 775 F.3d at 454 (quoting *Morales*, 504 U.S. at 388); *see also United Parcel Serv., Inc. v. Flores-Galarza*, 318 F.3d 323, 335 (1st Cir. 2003). ADA preemption will not apply if the connection is "too tenuous, remote, or peripheral." *Morales*, 504 U.S. at 390 (citation and quotations omitted). Thus, the ADA would not preempt state laws prohibiting gambling or prostitution, *id.* at 390, nor would a "state regulation that broadly prohibits certain forms of conduct and affects, say, truckdrivers, only in their capacity as members of the public (*e.g.*, a prohibition on smoking in certain public places)" be preempted. *Rowe*, 552 U.S. at 375. Finally, although the inquiry into whether the linkage question is satisfied may be supported by empirical evidence,

24

such evidence is not required. *See Overka*, 790 F.3d at 40-41. Instead, courts are free to consider the logical effect that a state law claim would have on an airline's rates, routes, or services. *See id.*

### B.   Analysis

Turning first to the mechanism question, the Plaintiffs' claims in Count I are based on 26 M.R.S.A. §§ 663, 664, 670 and Maine common law. *See* Compl. ¶¶ 2, 19, 63. The Plaintiffs accordingly concede that the mechanism question can be answered in the affirmative. Pl.'s Opp'n 12. The focus of the dispute, therefore, hinges on linkage. The principal question is whether the Plaintiffs' state law claims are "sufficiently 'related to a price, route, or service of an air carrier.' " *Bower*, 731 F.3d at 93 (quoting *Brown*, 720 F.3d at 63).

The Plaintiffs' claims are centered on the allegation that the Defendants wrongly classified them as independent contractors rather than employees while restoring the Super Star aircraft, thereby depriving them of certain wages and benefits. The Defendants make several arguments that the Plaintiffs' state law claims relate to the services and prices of Lufthansa and thus are preempted. First, they claim that Lufthansa's luxury transportation service aboard the Super Star will be affected by the outcome of the Plaintiffs' state claims.  Second, they contend that if Plaintiffs are considered employees, they will qualify for reduced airfare benefits, take seats on other flights offered by Lufthansa and its affiliates, and, in turn, impact the ticket prices and the number of seats available on those flights. Finally, the Defendants warn that failing to find that the Plaintiffs' state labor claims are

preempted will have far-reaching consequences for other aircraft repair stations in Maine.

### 1.   The Super Star's Luxury Transportation Service

The Defendants first argue that "[t]he repair work itself, designed to enable a plane to return to airworthy status and be used in flight, is logically related to a service" and that "without an airworthy plane . . . there can be no passenger service." Joint. Mot. for Summ. J. 22 (internal quotation marks omitted). The Plaintiffs' claims, they argue, implicate Lufthansa's ability to provide transportation services to its passengers. They contend that the unique experience of flying on the vintage Super Star is a luxury transportation service similar to First Class or Business Class. Joint Mot. for Summ. J. 23-24. Ultimately, they contend that if the Plaintiffs prevail on their state claims, it will have a significant forbidden effect on this luxury service because reclassification will either: (1) delay reintroduction of the Super Star, or (2) potentially jeopardize the entire project. Joint Mot. for Summ. J. 23-24.

This "luxury transportation" service argument does not fit neatly into the First Circuit's definition of "services."[17] The Defendants have not provided—and I have not

---

[17]   The Supreme Court has treated the term "service" expansively, but it has never defined it. *See Bower*, 731 F.3d at 94 (citing *Rowe*, 552 U.S. at 373). The First Circuit has adopted the Fifth Circuit's definition of "service," which is defined broadly as "a 'bargained-for or anticipated provision of labor from one party to another,' thus leading to 'a concern with the contractual arrangement between the airline and the user of the service.' " *Tobin*, 775 F.3d at 453 (quoting *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) (en banc)). "Matters 'appurtenant and necessarily included with the contract of carriage between the passenger or shipper and the airline,' such as 'ticketing, boarding procedures, provision of food and drink, and baggage handling' are all included under the mantle of 'service.' " *Id*. (quoting *Hodges*, 44 F.3d at 336). "[T]ransportation itself" also falls under the ambit of the term "service." *Hodges*, 44 F.3d at 336. The pertinent analysis asks "whether enforcement of the plaintiff's claims would impose some obligation on an airline-defendant with respect to conduct that, when properly undertaken, is a service." *Tobin*, 775 F.3d at 454. The inquiry "does not require that the plaintiff be the customer for whom a service is undertaken[,]" nor are claims beyond the ADA's

found—a case addressing a similar factual scenario. The purported service implicated, flights on the Super Star, is not a service that Lufthansa currently offers to its customers. Indeed, the Super Star has not been airworthy in at least ten years.

The argument could be made that flights on the Super Star constitute a service because such flights are an "anticipated provision of labor" that an airline intends to offer to its customers. *See Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995). But an anticipated provision of labor, in context, seems to refer to items that customers anticipate airlines will provide to them when they enter into a "contractual arrangement" with an airline. *See Tobin,* 775 F.3d at 453 (defining service to "items such as ticketing, boarding procedures, provision of food and drink, and baggage handling," in addition to the transportation itself). Lufthansa customers currently cannot enter into a contractual arrangement to fly on the Super Star.  And although "service" includes steps that "occur before . . . the airplane is actually taxiing or in flight[,]" *DiFiore*, 646 F.3d at 87-88, I do not believe the definition can be extended to encompass a service that is not yet in existence.

The Defendants cite several cases in support of their contention that the Plaintiffs' claims implicate the Super Star's transportation services. *See* Joint Mot. for Summ. J. 22 (citing cases). However, these cases are distinguishable because they involved claims that had the potential to disrupt the air carriers' efforts to provide actual transportation services to their passengers.  *See Botz v. Omni Air Int'l,* 286

---

reach "simply because the parties to the lawsuit were not the parties to the transaction that engendered the services." *Id.*

F.3d 488, 494 (8th Cir. 2002) ("[T]he Minnesota whistleblower statute has a forbidden connection with air-carrier services" because "[i]t includes broad authorization to flight attendants to refuse assignments, jeopardizing an air carrier's ability to complete its scheduled flights."); *Tucker v. Hamilton Sundstrand Corp.*, 268 F. Supp. 2d 1360, 1364 (S.D. Fla. 2003) (internal quotation marks omitted) ("Tucker acknowledges that UTC's violation of FAA regulations could result in interruption of an air carrier's service—that is, a defective rotor could result in the generator not supplying power to the aircraft, resulting in the aircraft not pushing away from the gate."); *Marlow v. AMR Servs. Corp.*, 870 F. Supp. 295, 299 (D. Haw. 1994) ("Jetbridges are also an integral part of air carrier services, no matter who maintains them. Keeping the bridges in working order is critical to today's passenger air travel."); *Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 372 (Tex. App. 2007) ("It is undisputed that Miller's refusals to pilot aircraft resulted in the grounding of the aircraft. Grounding aircraft directly affected FOC's point-to-point transportation services."); *Regner v. Nw. Airlines, Inc.*, 652 N.W.2d 557, 563 (Minn. Ct. App. 2002) (relying on *Botz* in holding that the ADA preempts a whistleblower claim). Unlike the cases cited above, transportation on the Super Star is not a service that is currently being offered to Lufthansa's customers; it is a service that may be offered in the future (at some point). Although the Plaintiffs' claims would likely be preempted if they actually disrupted or had the potential to disrupt ongoing transportation, that is simply not the case here.[18]

---

[18]     LTNA makes the argument that "the MRO services, such as those provided by Plaintiff and LTNA, are the type of service that has historically been recognized as preempted by the ADA." LTNA's

Even assuming *arguendo* that the Plaintiffs' claims did implicate Lufthansa's future passenger transportation service, the connection is too attenuated for preemption to occur. For instance, in *Gary v. Air Group, Inc.*, the United States Court of Appeals for the Third Circuit held that the plaintiff's whistleblower claim was not preempted because the relationship between his whistleblower report and an airline's service was too attenuated. 397 F.3d 183, 189 (3d Cir. 2005). The court reasoned that the connection was too strained because the plaintiff's "actions did not interrupt any scheduled flights, nor did they have the potential to ground any scheduled flights, for the simple reason that no flights were scheduled." *Id*.

The United States District Court for the Eastern District of New York reached a similar conclusion in *Ulysse v. AAR Aircraft Component Servs.,* 841 F. Supp. 2d 659 (E.D.N.Y. 2012). There, the plaintiff, a mechanic, brought a whistleblower suit against his employer, a non-airline company that provided repairs and maintenance services for commercial airlines. *Id.* at 664. In rejecting the employer's ADA preemption argument, the court found that:

> The possibility of an effect on aircraft services seems even more remote under the facts of this case as opposed to others, because [the plaintiff] is not himself an employee of the airlines and thus does not provide

---

Reply 8. The relevant "service" for purposes of the preemption analysis is not the work performed by the Plaintiffs nor the Defendants (none of which are airlines). The proper inquiry rather focuses on how the Plaintiffs' legal claims impact the services offered by an airline. *See Tobin*, 775 F.3d at 454 (emphasis added) ("[T]he relevant inquiry is whether enforcement of the plaintiff's claims would impose some obligation on an airline-defendant with respect to conduct that, when properly undertaken, is a service."). LTNA further argues that "MRO services directly affect the experiences for which passengers bargain" because such work can lead to "flight delays or cancellations as a result of maintenance issues." LTNA's Reply 8; Joint Mot. for Summ J. 25. But the claims at issue here do not impact these concerns because Lufthansa does not currently offer its passengers transportation on the Super Star. In analyzing whether there is a prohibited effect on services under the ADA, the devil is in the details. This is not a case involving maintenance or repair to aircraft that are in the working fleet.

> services directly to consumers. Rather, his role is more attenuated in
> that [the employer] merely contracts with airline companies to do repair
> work on their planes. It is hard to imagine how a third-party repair
> servicer could have the same impact on the services of an airline as, for
> example, a flight attendant or a baggage carrier, who is a direct
> employee of the airlines.

*Id.* at 675. Accordingly, the court held that express preemption under the ADA was

not applicable. *Id.* at 676.

Like the claims at issue in *Gary*, the claims here are too attenuated from an

airline's services because they do not affect scheduled flights on the Super Star. *See*

*Gary*, 397 F.3d at 189. This conclusion is bolstered by the fact that the Plaintiffs work

for third-parties that contract with airlines making the impact on aircraft services

even more remote. [19] *See Ulysse*, 841 F. Supp. at 676. Thus, this argument fails.

### 2.    The Effect on Rates and Services Caused by Discounted Travel Benefits Given to Employees

The Defendants contend that, "if Plaintiff and other workers were forced to be

classified as employees of LTNA and GAS, they would be entitled to the benefits

---

[19]    The fact that the Defendants are not air carriers makes this case distinguishable from controlling precedent interpreting the ADA. *See, e.g., Ginsberg*, 134 S. Ct. at 1426 (ADA case addressing Northwest's frequent flyer program); *Wolens*, 513 U.S. at 224 (ADA case involving American Airlines); *Morales*, 504 U.S. at 380 (ADA case involving several airlines); *Overka*, 790 F.3d at 36-37 (ADA case involving American Airlines); *Bower*, 731 F.3d at 88 (ADA case involving EgyptAir Airlines Company); *Brown*, 720 F.3d at 62 (ADA case involving U.S. Airways and United airlines); *DiFiore*, 646 F.3d at 84 (ADA case involving American Airlines). It also makes this case distinguishable from controlling precedent interpreting the FAAAA, as all of those cases involved motor carriers. *See, e.g., Rowe*, 552 U.S. at 369 (FAAAA case involving several transport carrier associations made up of member carriers); *Healey*, 821 F.3d at 189 (FAAAA case involving same-day delivery service companies); *Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 432 (1st Cir. 2016) (FAAAA case involving FedEx); *Massachusetts Delivery Ass'n v. Coakley*, 769 F.3d 11, 14 (1st Cir. 2014) (FAAAA case involving same-day delivery service companies); *United Parcel Serv., Inc. v. Flores-Galarza*, 318 F.3d 323, 335 (1st Cir. 2003) (FAAAA case involving UPS). However, some non-binding authorities found ADA preemption of claims against non-air carriers where those claims had a sufficient connection to an air carrier's routes, rates or services. *See Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 287 n.8 (5th Cir. 2002) ("ADA preemption is not limited to claims brought directly against air carriers."); *see also Gordon v. Amadeus IT Grp., S.A.*, No. 15-cv-5457-KPF, 2016 WL 3676678, at *5 (S.D.N.Y. July 6, 2016) (citing cases).

LTNA provides to its employees, including discounted travel on any of the Lufthansa Group's airlines." Joint Mot. for Summ. J. 24; *see also* JSMF ¶ 69. In terms of flight benefits, LTNA's employees, immediate family members and companions enjoy "reduced-fares" with "Lufthansa, Star Alliance and ZED partners." JSMF ¶ 32. Defendants argue that giving reduced fares to this group of employees and their families, would require Lufthansa to raise rates for other passengers. Joint Mot. for Summ. J. 24. Similarly, the reduced-fare seats that these workers and their families would take "would limit the services that the airline was able to offer—requiring its other general passengers who would have chosen that seat[] to either elect to fly in a different class or on a different flight." Joint Mot. for Summ. J. 25.

The Defendants rely heavily on *Ginsberg*, where the Supreme Court held that the plaintiff's state law claim for breach of the implied covenant of good faith and fair dealing was connected to an airline's rates and services because the airline's frequent flyer program "award[ed] mileage credits that can be redeemed for tickets and upgrades." 134 S. Ct. at 1431. The Court reasoned that, "[w]hen miles are used in this way, the rate that a customer pays, *i.e.*, the price of a particular ticket, is either eliminated or reduced." *Id.* The Court also held that the frequent flyer program was connected to services because it provided "access to flights and to higher service categories." *Id.*

Here, if the Plaintiffs were reclassified as LTNA's employees, they would be entitled to reduced-fares on several different airlines. *See* JSMF ¶ 32. As in *Ginsberg*, this logically would impact the price of other tickets and the availability of seats. *See*

*Ginsberg*, 134 S. Ct. at 1431; *see also Concovich v. Air Evac Ems, Inc.*, No. 15-cv-0294-MJR-DGW, 2016 WL 843276, at *2 (S.D. Ill. Mar. 4, 2016) ("[D]iscounts naturally impact rates in a manner sufficient to trigger preemption.").

The Plaintiffs attempt to distinguish *Ginsberg* by contending that Ginsberg was "a customer of Northwest Airlines who sought reinstatement into the airline's frequent flyer program" so that he could access a number of valuable benefits, whereas the "Plaintiffs—who provide work for non-airlines on what will ultimately be a novelty aircraft—simply seek to be properly classified as employees." Pls.' Opp'n 19. It is true that the purpose of the suit in *Ginsberg* was to gain access to reduced fares and other flight-related benefits. But the question is whether a plaintiff's state law claim is sufficiently related to a price or service of the airline, not whether it is the plaintiff's purpose to effect prices or services. The connection between the claim and the airline does not need to be direct. *See Healey,* 821 F.3d at 191 ("[P]reemption is purposefully expansive and may occur even when the state law has only an indirect effect on prices, routes, or services.").

The Plaintiffs protest that the effect on "prices offered by an airline as a result of a fringe benefit that *might* flow from proper classification of the Plaintiff and the class members in this matter is simply 'too tenuous, remote, or peripheral.' " Pls.' Opp'n 16-17 (quoting *Morales*, 504 U.S. at 390). They argue that reclassification "will not significantly or perceptibly impact the price of airline tickets on the airlines operated by LTNA's parent company because . . . tickets sold to the general public to fly *on the Super Star* will be priced on the basis of a break-even policy." Pls.' Opp'n 19

(internal quotations omitted) (emphasis added). But in focusing on the prices for the Super Star, the Plaintiffs have missed the Defendants' primary argument.[20] The fact that ticket prices for the Super Star will be sold on a break-even basis does not demonstrate that there will be no effect on the price of airline tickets for other aircraft operated by Lufthansa (or other airlines that offer reduced prices for LTNA's employees). The Defendants contend that reclassifying the Plaintiffs as employees will effect ticket pricing on all of the airlines that offer reduced prices for LTNA's employees. And the Plaintiffs have not responded to the Defendants' argument regarding how the availability of reduced fares for employees and their families will impact the services that airlines are able to offer to other passengers.

The cumulative effect on the airlines' ticket prices is likely more significant here than it was in *Ginsberg*, as this case involves dozens of individuals where *Ginsberg* was limited to just one customer. Furthermore, this case is a far cry from the examples of state laws that the Supreme Court indicated would be too tenuous, remote, or peripheral to have preemptive effect. *See Rowe*, 552 U.S. at 375 (explaining that a state law that "broadly prohibits certain forms of conduct and affects, say, truckdrivers, only in their capacity as members of the public (*e.g.*, a prohibition on smoking in certain public places)" would not be preempted); *Morales*, 504 U.S. at 390 (explaining that "state laws against gambling and prostitution" would not be preempted if applied to airlines). Thus, based on *Ginsberg*, the Plaintiffs' state law

---

[20]      The Plaintiffs argue that because the Super Star will adjust its pricing to break-even, it will therefore absorb any higher costs associated with employee status and there will accordingly be no impact on airfare prices.

claims against LTNA are preempted because they are sufficiently connected to an airline's prices and services.

Plaintiffs have not contested the Defendants' factual assertion that LTNA's employees are given discounted air travel benefits, *see* JSMF ¶ 32, or their assertion that if these Plaintiffs were reclassified as LTNA employees, they, too, would get the discounted air travel benefits. *See* JSMF ¶ 69. And if the claim in *Ginsberg* was sufficiently connected to an airline's prices and services to trigger ADA preemption, then the state law claims asserted here are likewise barred by the ADA's expansive reach. Because a win for the Plaintiffs on their misclassification claims would have the logical impact of affecting Lufthansa's rates and services, and mindful that "[t]he Supreme Court has instructed that the 'related to' language of the ADA is meant to be construed broadly," the ADA preempts the Plaintiffs' state law claims against LTNA.[21] *Tobin*, 775 F.3d at 454 (citing *Morales*, 504 U.S. at 383-84).

---

[21]    I do not agree with the Plaintiffs that the fact that this is a background labor law saves it from the preemptive effect of the ADA. The Plaintiffs rely heavily on a suggestion in *DiFiore* that a state's wage laws would not be preempted by the ADA, but *DiFiore* is merely the opening chapter of the First Circuit's case law addressing this issue. *See* Pls.' Opp'n 14. In *DiFiore*, the First Circuit predicted in dicta that "the Supreme Court would be unlikely—with some possible qualifications—to free airlines from most conventional common law claims for tort, *from prevailing wage laws*, and ordinary taxes applicable to other businesses." 646 F.3d at 87 (emphasis added). But the *DiFiore* court went on to note that such claims do "impact airline operations—and so, indirectly may affect fares and services." *Id.* The court ultimately held that the Massachusetts tips law being invoked by the skycap plaintiffs was preempted even though the law, "like prevailing wage laws, [was] aimed at protecting employee compensation." *Id.* So, while *DiFiore* says in dicta that a state's prevailing wage laws would probably not be preempted by the ADA, its holding was that the Massachusetts tips law was preempted by the ADA. Since *DiFiore*, the First Circuit has decided a number of cases brought by delivery drivers claiming they were incorrectly classified as independent contractors rather than employees and has concluded that the Massachusetts Independent Contractor Statute is preempted under the FAAAA. *See Healey*, 821 F.3d at 189*; Schwann*, 813 F.3d at 432; *Coakley*, 769 F.3d at 14. The First Circuit rejected a bright-line rule immunizing all generally applicable background labor laws from preemption and advised lower courts to focus on the "real and logical effects" of the state law at issue. *Coakley*, 769 F.3d at 20.

34

This conclusion, however, does not apply to GAS. Although the Plaintiffs failed to point out that GAS is in a different posture than LTNA for purposes of the preemption argument, there is no evidence in the record that GAS's employees are entitled to reduced-fares on the Lufthansa Groups passenger airlines. Thus, unlike the claims against LTNA, the Plaintiffs' claims against GAS do not relate to an airline's rates or services. *See De La Vega v. The San Juan Star*, 377 F.3d 111, 115 (1st Cir. 2004) ("[T]he district court cannot grant a motion for summary judgment merely for lack of any response by the opposing party, since the district court must review the motion and the supporting papers to determine whether they establish the absence of a genuine issue of material fact." (citation and quotations omitted)).

Because I have found that ADA preemption applies for LTNA but not for GAS, I must go on to address whether the Plaintiffs' claims against GAS are preempted under the Defendants' broader policy arguments.

### 3.   The Defendants' Policy Arguments for Preemption

#### a.   The Impermissible Meddling Argument

According to the Defendants, my ruling on this case "will not only affect the classification of individuals working on the Super Star [p]roject, but all MRO workers in the State of Maine." Joint Mot. for Summ. J. 25. The Defendants point out that the Federal Aviation Administration ("**FAA**") requires the holder of an air station certificate (LTNA) to "exercise a significant degree of control over the individuals" working at the repair station. Joint Mot. for Summ. J. 18. Thus, because the Plaintiffs' overtime claims depend heavily on the right to control, they contend that "the application of Maine's overtime law (and the statutory or common law employee

35

status test) . . . could impermissibly dictate the type of employment relationship MRO service providers in Maine (and air carriers who perform their own MRO services) utilize." Joint Mot. for Summ. J. 20. Moreover, they contend that a win for the Plaintiffs will lead to a patchwork of state regulation that causes MRO providers to airlines "to pick and choose locations for operations as a result of issues other than competitive market forces." Joint Mot. for Summ. J. 21 (quotations omitted).

The Defendants overstate their case. I am required to assess the real and logical effects of the Plaintiffs' state claims on routes, prices, and services of air carriers. ADA preemption demands "an individualized assessment of the facts underlying each case to determine whether a particular state-law claim will have a forbidden effect." *Tobin*, 775 F.3d at 456. The impact that this case will have on other airlines and MRO providers is not an issue which is before me. But even if it were, the Defendants fail to acknowledge that the work being performed on the Super Star—a complete retrofitting of a vintage aircraft taking years to complete—is simply not the type of classic MRO work being done on aircraft that are removed from the fleet for repair or even overhaul. It is not a foregone conclusion that this case will establish a rule for the rest of the industry. Further, the work at issue is being performed pursuant to LTNA's air station certificate, not GAS's. Joint Mot. for Summ. J. 18; JSMF ¶ 49. Thus, the Plaintiffs' claims against GAS do not implicate the purported concern regarding interference with the requirements imposed on air station certificate holders by the FAA. I see no logical basis from which to conclude

that classifying GAS workers as employees would have any effect on an air carrier's rates, routes or services.

In addition, the claims here do not run the risk of creating a patchwork of state legislation that would force MRO providers "to pick and choose locations for operations as a result of issues other than competitive market forces." Joint Mot. for Summ. J. 21 (internal quotations omitted). In *Schwann*, the First Circuit found that Prong 2 of the Massachusetts Independent Contractor Statute[22] created this type of problem because "it makes any person who performs a service within the usual course of the enterprise's business an employee for state wage law purposes[,]" whereas under the FLSA "and the law of many states, the relationship between the service performed and the usual course of the enterprise's business is simply one among many factors to be considered." *Schwann*, 813 F.3d at 438. The Court found this problematic because it forced employers to use employees to perform delivery services in Massachusetts "even if those persons could be deemed independent contractors under federal law and the law of many states." *Id.* "This relatively novel aspect of Prong 2[,]" the Court explained, "r[an] counter to Congress's purpose to avoid 'a patchwork of state service-determining laws, rules, and regulations' that it

---

[22]    In full, the statute provides that a worker performing any service is an employee unless:

(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and
(2) the service is performed outside the usual course of the business of the employer; and,
(3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

Mass. Gen. Laws ch. 149, § 148B(a).

determined were better left to the competitive marketplace." *Id.* (quoting *Rowe*, 552

U.S. at 373). But the Court concluded by explaining that:

> We do not hold that FedEx has free rein to classify workers by fiat as
> independent contractors. In line with our explanation in *DiFiore*, motor
> carriers are not exempt "from state taxes, state lawsuits of many kinds,
> and perhaps most other state regulation of any consequence." Such state
> laws that are more or less nationally uniform, and therefore pose no
> patchwork problem, or that have less of a reference to and effect on a
> carrier's service and routes *pose closer questions than that presented in
> this case.*

*Id.* at 440 (emphasis added) (quoting *DiFiore*, 646 F.3d at 89).

The Maine Law Court has not yet had an occasion to describe the test to be

used to determine whether a worker is an employee or an independent contractor

under 26 M.R.S.A. § 664. As I noted in my previous decision certifying this class, the

"right to control" test, which utilizes the eight-factors set forth in *Murray's Case*, 154

A. 352, 354 (Me. 1931),[23] is likely the test for the state law claims at issue here. Order

on Pls.' Mot. for Class Certification 11-12. Like Prong 2, the "right to control" test

does take into account whether the work is part of the regular business of the

employer. However, like most jurisdictions, this is just one of many factors at play.[24]

---

[23]    These eight factors are:

> (1) the existence of a contract for the performance by a person of a certain piece or kind
> of work at a fixed price; (2) independent nature of his business or his distinct calling;
> (3) his employment of assistants with the right to supervise their activities; (4) his
> obligation to furnish necessary tools, supplies, and materials; (5) his right to control
> the progress of the work except as to final results; (6) the time for which the workman
> is employed; (7) the method of payment, whether by time or by job; (8) whether the
> work is part of the regular business of the employer.

*Murray's Case*, 154 A. 352, 354 (Me. 1931).

[24]    S*ee, e.g., Fesler v. Whelen Eng'g Co.*, 688 F.3d 439, 442-43 (8th Cir. 2012) (Iowa); *FedEx Home
Delivery v. N.L.R.B.*, 563 F.3d 492, 496 n.1 (D.C. Cir. 2009) (NLRB); *Search v. Uber Techs., Inc.*, 128
F. Supp. 3d 222, 231 (D.D.C. 2015) (District of Columbia); *Curtsinger v. State Farm Mut. Auto. Ins.
Co.*, 120 F. Supp. 3d 857, 859-60 (S.D. Ind. 2015) (Indiana); *Taylor v. Jewish Hosp. & St. Mary's*

Accordingly, contrary to the Defendants' argument, this case does not implicate the "patchwork problem" discussed in *Schwann*. Rather, based upon the number of jurisdictions that use similar multi-factor tests to determine whether a worker is an employee or independent contractor, Maine's law is "more or less nationally uniform." *Schwann*, 813 F.3d at 440. And it is more likely, then, that Maine's law is the "type of pre-existing and customary manifestation of the state's police power that . . . Congress intended to leave untouched." *Id.* at 438.

### b.   Increased Costs will Lead to Higher Prices

The Defendants contend that the Plaintiffs prevailing on their claims would "result in all air carriers in the State of Maine being required to classify all MRO service providers as employees—with all the costs associated with such classification." Joint Mot. for Summ. J. 26. Given the significance of these costs, "the price for passenger service would potentially have to" increase to "offset the increase in the labor cost of the repairs necessary to make the Super Star—or any other aircraft for that matter—airworthy." Joint Mot. for Summ. J. 27. Moreover, the Defendants maintain that the Plaintiffs have conceded that their claims will impact rates because they have admitted that ticket prices for the Super Star will "be adjusted to support the maintenance of the plane." GAS's Reply 10; *see also* JSMF ¶ 46.

---

*Healthcare, Inc.*, 26 F. Supp. 3d 642, 648 (W.D. Ky. 2014) (Kentucky); Restatement (Second) of Agency § 220(2) (1958).

Like the meddling argument described above, this argument glosses over the unique facts of this case and also ignores the individualized assessment that ADA preemption requires. As the Defendants themselves recognize, "[t]he plane being restored in this case is a distinctive, one-of-a-kind aircraft, which has not been addressed by other courts in other cases." GAS's Reply 9. Whether the Plaintiffs succeed on their misclassification claim depends on the application of multiple factors to the unique facts of this case. Thus, I do not agree that a win down the road for the Plaintiffs will lead to the classification of all MRO workers in Maine as employees.

The First Circuit does not

> endorse [the] view that state regulation is preempted wherever it imposes costs on airlines and therefore affects fares because costs must be made up elsewhere, *i.e.*, other prices raised or charges imposed. This would effectively exempt airlines from state taxes, state lawsuits of many kinds, and perhaps most other state regulation of any consequence.

*DiFiore*, 646 F.3d at 89 (internal quotations omitted). Moreover, the First Circuit rejected this "increased costs argument" in the context of claims that were asserted directly against an airline-defendant. *See id.* By contrast, the "increased costs argument" is even more attenuated as it applies to GAS. GAS is several steps removed from the air carrier. Accordingly, the fact that GAS's labor costs may increase as a result of reclassification and these costs could potentially be passed on to airlines is insufficient to invoke ADA preemption.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Defendants' joint motion for summary judgment as to the state law claims contained in Count I against

40

LTNA and **DENIES** the remainder of the motion for summary judgment (ECF No. 100).  The Court **DENIES** the Defendants motion for leave to file a motion to strike as moot. (ECF No. 120).

SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 23rd day of September, 2016.